UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>    Plaintiff,<br>  v.<br><br>**DEERE & COMPANY, et al.**<br><br>    Defendants. | Case No. 1:16-cv-08515 |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO SUPPLEMENT PROTECTIVE ORDER

Defendants' proposed supplement to the Protective Order would allow their in-house attorneys to access sensitive business information of Defendants' competitors and customers. Such access raises a substantial danger that this information may be improperly disclosed to executives who make Defendants' important business decisions. It could also hinder the ability of the United States to gather such information in future efforts to enforce the antitrust laws. In the face of these risks, Defendants' proposed supplement should be denied.

### BACKGROUND

On August 31, 2016, the United States sued Deere & Company ("Deere"), Precision Planting LLC ("Precision"), and Monsanto Company ("Monsanto") (collectively, "Defendants"), alleging that Deere's planned acquisition of Precision from Monsanto violates Section 7 of the Clayton Act. The Court subsequently entered a Stipulated Confidentiality and Protective Order ("the Order"), which allows parties and nonparties to designate material such as trade secrets and financial data as "Confidential." (R. 51 at 2-3). The Order also prohibits the disclosure of such confidential information, except to a limited class of persons, such as outside counsel and court personnel. (R. 51 at 5-6).

1

On September 29, 2016, Defendants moved to supplement the Order to expand the class of persons to whom confidential information may be disclosed. (R. 63). Defendants in particular ask the Court to allow disclosure of confidential information to two in-house attorneys: Ms. Lisa McCraw of Deere and Mr. Randy Mariani of Monsanto.

The Court directed the United States to respond to Defendants' motion on or before October 11, 2016. (R. 66). In accordance with the Court's order, the United States now explains that Defendants have failed to carry their burden to justify their proposed supplement.

## ARGUMENT

**1. Defendants Fail to Meet the Standard for In-house Counsel Access**

Defendants' proposed supplement is neither warranted nor appropriate because Defendants have not satisfied the standard for granting access to confidential information to in-house counsel. That standard requires examining whether granting access would raise "an unacceptable risk of or opportunity for 'inadvertent disclosure' of confidential information." *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 407 (N.D. Ill. 2006) (quoting *Matsushita Elec. Indus. Co., Ltd. v. United States*, 929 F.2d 1577, 1579 (Fed. Cir. 1991)).

The risk of "inadvertent disclosure" encompasses several considerations. First, and most important, is the question whether the in-house counsel at issue are involved in their employers' "competitive decision-making." *See Fed. Trade Comm'n v. Advocate Health Care Network*, 162 F. Supp. 3d 666, 667 (N.D. Ill. 2016). Such involvement increases the risk of inadvertent disclosure and renders access to confidential information inappropriate. *Autotech*, 237 F.R.D. at 408. The nature of the claims at issue in the litigation is an additional consideration. *Id.* at 411. When those claims make inadvertent disclosure more likely, or when those claims raise concerns

about deleterious effects in future cases, granting in-house counsel access to confidential information is unwarranted. *See id.*

Finally, the risk of inadvertent disclosure and the potential harms resulting from such disclosure must be balanced against the likely prejudice that prohibiting access to confidential information would have on the moving party's ability to litigate its case. *See id.* at 408 ("That risk must then be balanced against the harm that will result to the party employing in-house counsel from restrictions on the latter's access to the protected information."). This balancing strongly favors prohibitions on access to confidential information. The moving party must show that—in the absence of such access for its in-house attorneys—it would suffer "severe and undue prejudice." *Id.* at 412. In addition, the moving party's burden is particularly heavy where, as here, the confidential information includes the sensitive data of nonparties. *See Cont'l Auto. Sys., U.S., Inc. v. Omron Auto. Elecs., Inc.*, No. 14 C 3731, 2014 WL 2808984, at *5 (N.D. Ill. June 20, 2014) ("[T]he party requesting disclosure must make a strong showing of need, especially when confidential information from a nonparty is sought." (citation and quotation marks omitted)).

Here, the roles and duties of the in-house counsel at issue, the nature of the United States' claim, and the limited benefit of allowing access to the relevant information all indicate that Defendants fail to meet the applicable standard.

2. **The positions and duties of Defendants' in-house counsel present an unacceptable risk of inadvertent disclosure of confidential information**

The first question is whether Defendants' in-house attorneys are involved in the "competitive decision-making" of Deere and Monsanto. *See Advocate Health*, 162 F. Supp. 3d at 669. Courts use the phrase "competitive decision-making" not as "a self-defining test, but as a serviceable *shorthand* for a counsel's activities, association, and relationship with a client that

are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Id.* (emphasis in original) (internal quotation marks omitted). Analyzing the role of in-house counsel thus "involves a careful and sensitive assessment of the entire setting in which in-house counsel functions." *Id.* This requires a "comprehensive inquiry into in-house counsel's actual (not nominal) role in the affairs of the company, his association and relationship with those in the corporate hierarchy who are competitive decision makers, and any other factor that enhances the risk of inadvertent disclosure." *Autotech*, 237 F.R.D. at 408.

In this case, the declarations from Defendants' in-house counsel actually undermine any claim that they lack involvement in the competitive decision-making of Deere and Monsanto.

Ms. McCraw of Deere states that she is uninvolved in competitive decision-making because "[t]here is no business person in [her] direct line of reporting" and because she does not "report to any person with responsibilities" in pricing, marketing, or other sensitive areas. (R. 64-3 ¶¶ 5-6). But Ms. McCraw also asserts that she requires confidential information so that she can provide "informed input" to "both outside counsel and *management*," and to assist her in "advising and updating *management*." (R. 64-3 ¶¶ 3, 9 (emphasis added)). Hence, regardless of whether any "business person" is in Ms. McCraw's direct line of reporting, Ms. McCraw herself admits that her input—as informed by her access to confidential information—will be passed to Deere's management. Ms. McCraw's role thus presents the same "unacceptable risk of or opportunity for 'inadvertent disclosure'" that concerned the courts in *Autotech* and *Matsushita Electric*, *supra*.

The same is true of Mr. Mariani of Monsanto. He states that he is "not involved in any competitive decision-making," (R. 64-4 ¶ 5), but he also acknowledges that he seeks "full

4

knowledge" of the confidential information at issue so that he can "advis[e] Monsanto's *senior management*." (R. 64-4 ¶¶ 5-6 (emphasis added)). Thus, just as with Ms. McCraw, Mr. Mariani's "role in the affairs of the company" and his "relationship with those in the corporate hierarchy," *see Autotech*, 237 F.R.D. at 408, enhance the risk that confidential information will be inadvertently disclosed to Defendants' competitive decision-makers.

In addition, Defendants' own documents and those of their in-house counsel reflect the extent to which Ms. McCraw and Mr. Mariani are involved in the business affairs of their respective employers. Ms. McCraw, for example, states on her LinkedIn profile that she is skilled and knowledgeable in "Licensing," "Corporate Governance," "Contract Negotiation," and "Management." (*See* Plaintiff's Exhibit A). Ms. McCraw's experience in these areas thus suggests that she has been involved not only in litigation management, but also in advising Deere's management on business decisions, thereby implying that Ms. McCraw should not be granted access to confidential information. *See Advocate Health*, 162 F. Supp. 3d at 674 ("[G]iven the inconsistency between the Declarations of in-house counsel and their social media postings, it is now clear that the only sure way to protect the [nonparties'] confidential information is to carve out a special category of Highly Confidential information for them that is not accessible to in-house designees.").

Next, Monsanto's privilege log, provided during the investigation preceding this litigation, evidences the extent to which Mr. Mariani is involved with Monsanto's competitive decision makers. As detailed in the log, Mr. Mariani advises Monsanto management on ▄▄▄▄▄▄ (*see, e.g.*, PRIV0594, 0595, 0600, 0601, 0682, 0685, 0759, 0815 on Defendant's Privilege Log, attached as Plaintiff's Exhibit B); was involved with management on ▄▄▄▄▄▄ (*see* PRIV1030); and helped Monsanto's management assess ▄▄▄▄▄▄ (*see* PRIV0434, 0689).

5

Thus, rather than merely litigating cases, Mr. Mariani is routinely involved in Monsanto's contract negotiations and business transactions. *See Advocate Health*, 162 F. Supp. 3d 666, 671 ("[In-house counsel] advises Advocate on contract matters—so, he does at least participate and is involved in business decisions." (citation omitted)). Indeed, Monsanto's own documents confirm as much: Mr. Mariani is a member of Monsanto's "Global Business Operations Leadership Team," which handles topics such as finances, marketing, and product development. (*See* Plaintiff's Exhibit C). Mr. Mariani's role thus plainly presents an unacceptable risk of the inadvertent disclosure of confidential information to competitive decision-makers.

Nor do Defendants eliminate this risk with their proposed limitations on access to confidential information. Defendants propose that their in-house counsel be foreclosed from copying or handling such information outside of an ostensibly safe "electronic data room." (R. 64 at 5). The problem, however, is not that the information would be in the in-house attorney's hands or hard drives. It is that the information would be in their heads. As this Court has explained, "[t]he inescapable reality is that once an expert—or a lawyer for that matter—learns the confidential information that is being sought, that individual cannot rid himself of the knowledge he has gained; he cannot perform a prefrontal lobotomy on himself." *Advocate Health*, 162 F. Supp. 3d at 670. Defendants' proposed limitations are accordingly of no moment: their in-house counsel may scrupulously abide by those limitations, but the "inescapable reality," *see id.*, is that those same counsel will be considering the confidential information that they have gained whenever they are subsequently providing "informed input" to their senior management. Defendants' proposed limitations therefore do not obviate the risk of inadvertent disclosure of confidential information.

Finally, Defendants' suggestion that their in-house attorneys' ethical obligations compel those attorneys to seek access to confidential information is unpersuasive. Defendants maintain that the Model Rules of Professional Conduct establish that parties—and thus in-house counsel, rather than outside counsel—must have ultimate decision-making authority during litigation. (*See* R. 64 at 3, 6). Yet even assuming that this assertion is true, this Court has recognized that prohibiting access to confidential information does not violate an in-house lawyer's ethical duties. *See, e.g.*, *Advocate Health*, 162 F. Supp. 3d at 668 (prohibiting access even though "in-house counsel are officers of the court [and] are bound by the same Code of Professional Responsibility" as outside counsel); *Autotech*, 237 F.R.D. at 407 (same). Indeed, the logic of Defendants' argument would require that in-house counsel always be granted access to confidential information—a result that courts surely have not allowed, *e.g.*, *Advocate Health*; *Autotech*, *supra*. The ethical obligations of in-house counsel thus do not support Defendants' request for the disclosure of confidential information.

3. **The nature of the claims in this case increases the risk of inadvertent disclosure and implicates the government's ability to enforce the antitrust laws in the future**

The types of claims in this case also weigh against granting Defendants' in-house counsel access to confidential information. First, the claims necessarily involve the sensitive pricing, product development, and marketing plans of Defendants and their competitors. The United States alleges that "[b]arriers to economically meaningful entry or expansion in the [relevant] market are high," and that "new entry or expansion by existing competitors is unlikely to prevent or counteract the planned acquisition's likely anticompetitive effects." (Compl. ¶ 40). Further, the United States contends that, *inter alia*, "[o]ther firms seeking to enter the market" would need to "spend a significant amount of time and money to develop their own products," and overcome the "extensive intellectual property rights held by Defendants." (Compl. ¶¶ 40-41).

7

These claims are founded on an assessment of the ability of Defendants' competitors to develop, distribute, and market new products. Sharing the information used to support these claims with Defendants' in-house counsel, so that those counsel can in turn provide "informed input" to Defendants' management, would thus give Defendants themselves improper insight into the ability of other companies to compete with Defendants in the future. *See Cont'l Auto. Sys.*, 2014 WL 2808984, at *3 (observing that "courts presume that disclosure to a competitor is more harmful than disclosure to a non-competitor").

This harm to nonparties is especially pronounced in the current case because some of the nonparties are not only competitors of Defendants—they are also customers. In particular, nonparties CNH Industrial and AGCO Corporation have partnered with Precision to "factory-install Precision Planting's [product] on their new planters." (Compl. ¶ 21). Disclosing confidential information about the sales, marketing, or profitability of CNH or AGCO would therefore give Monsanto, Deere, and Precision an unwarranted advantage in any future negotiations involving the sales of Precision's products to those companies. *Cf. Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1346 (7th Cir. 1986) (approving of decision to limit access to confidential data to outside counsel because "[parties] armed with the data could use it to advantage in the next round of negotiations" with the disclosing companies).

Second, the types of claims currently at issue weigh against disclosure of confidential information because the claims implicate the United States' ability to enforce the antitrust laws in the future. Much of the information to which Defendants' in-house counsel seek access was provided to the United States by nonparties in the same industry as Defendants. These nonparties could reasonably expect that the information they provided would not be disclosed in a way that harms them in the future.

8

Defendants' proposed supplement to the Order would eviscerate that expectation. By allowing Defendants' in-house counsel to gain access to their competitors' and customers' confidential information, Defendants' supplement would breach the competitors' expectations and violate their trust that the United States would safeguard their information.

This breach could have pernicious consequences. The United States depends on the cooperation of and information from nonparties when investigating potential violations of the antitrust laws. Yet disclosing such information to the disadvantage of those nonparties—as Defendants ask the Court to do in this case—could deter similarly situated parties from cooperating with the United States in future cases. *See, e.g.*, Report & Recommendation No. 1 of Special Master at 17, *United States et al. v. Aetna Inc. et al.*, No. 1:16-cv-1494 (D.D.C. Sept. 5, 2016) (attached as Plaintiff's Exhibit D) ("The Special Master finds persuasive Plaintiffs' argument that granting Defendants' in-house counsel access to the information at issue may deter non-parties from producing information to the government in future cases."); *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 11297188, at *1 (N.D. Cal. Jan. 21, 2014) ("If the Court required the information to be disclosed, it would chill investigations in the future where third party documents are essential."). Defendants' proposed supplement should accordingly be rejected because of the harm that the supplement could do to the United States' ability to enforce the antitrust laws.

**4.      Granting in-house counsel access to confidential information is unnecessary for Defendants to try this case**

The final question is whether a prohibition on in-house counsels' access to confidential information would cause such "severe and undue prejudice," *see Autotech*, 237 F.R.D. at 408, that the potential harm to Defendants outweighs the previously-identified risks. As explained

below, Defendants have not made the "strong showing," *see Cont'l Auto. Sys.*, 2014 WL 2808984, at *5, necessary to establish such prejudice.

First, the declarations of Ms. McCraw and Mr. Mariani fail to establish why they require fully informed access to competitors' business information to advise their corporate leaders about this litigation. They claim that they need the information to explain "the strengths and weaknesses" of the Defendants' case so that they can devise the correct "litigation strategy" for their companies to pursue. (R. 64-4 ¶ 6; *see also* R. 64-3 ¶ 7). As courts have recognized, however, an in-house attorney can perform his or her duties and assist his or her client without poring over the confidential information of other parties. *Fed. Trade Comm'n v. Sysco Corp.*, 83 F. Supp. 3d 1, 4 (D.D.C. 2015) ("Although Mr. Libby has not met the [standard for accessing confidential information], he is still able to assist outside counsel and advise Sysco on litigation strategy."). In-house counsels' request for access to confidential information in this case thus goes beyond the need to advise Defendants about the litigation and raises an unnecessary risk of disclosing the business information of Defendants' competitors.

Moreover, this is an antitrust case, and neither Ms. McCraw nor Mr. Mariani asserts any expertise—nor even any familiarity—with antitrust law. Their experience is instead limited to products liability, commercial law, construction cases, and patent infringement. (R. 64-3 ¶ 2; R. 64-4 ¶ 4). Ms. McCraw and Mr. Mariani have thus failed to establish how either of them could assess whether Defendants face a strong or weak antitrust claim, much less why competitors' sensitive information would be necessary to such an assessment.

Much more reasonable for Defendants and their in-house attorneys would be reliance on the independent assessments and litigation strategies of outside counsel. Defendants have retained David Meyer (of Morrison & Forrester) and Paul Friedman (of Dechert LLP), both of

10

whom are competent and experienced antitrust attorneys supported by leading law firms. Given the capabilities and experience of outside counsel, Defendants have not established that granting access to information for Ms. McCraw and Mr. Mariani would provide such a strong benefit that the confidential information at issue should be disclosed. *See Autotech*, 237 F.R.D. at 413 ("Requiring a party to rely on its competent outside counsel does not create an undue and unnecessary burden." (internal quotation marks omitted)); *see also id.* ("In view of retained counsel's competence, it is not clear how [Defendants'] position will be prejudiced by excluding [in-house] counsel from access." (quotation marks and some alterations omitted)).

The only explanation that Defendants have provided for their in-house attorneys' need to access confidential information is a bald assertion that such access is necessary to try this case. This unsubstantiated assertion is simply insufficient to carry Defendants' burden to justify further disclosure of the confidential information at issue. *See Advocate Health*, 162 F. Supp. 3d at 672 ("[G]iven the extraordinarily sophisticated, experienced and talented counsel in this case, the critical question is: why is it 'essential,' as the defendants put it, that in-house counsel, as opposed to outside counsel, review the [confidential information]? . . .The defendants have not come up with anything that would convince one that their outside counsel would be hamstrung in their trial preparations without input from in-house counsel in these circumstances.").

## **CONCLUSION**

Defendants' in-house counsel do not need access to the confidential information of Defendants' competitors and customers in order to litigate this case. And given in-house counsels' role in advising senior management and in negotiating Defendants' business transactions, granting such access would create an unnecessary and unjustified risk of the

inadvertent disclosure of this information. Defendants' request to supplement the Stipulated Confidentiality and Protective Order should therefore be denied.

Dated: October 11, 2016  /s/ William H. Jones II
William H. Jones II
Conor J. Craft
U.S. Department of Justice
Antitrust Division, Litigation III Section
450 Fifth Street, NW #4000
Washington, D.C. 20530
Telephone: (202) 515-0230
Facsimile: (202) 514-7308
bill.jones2@usdoj.gov

*Counsel for Plaintiff United States of America*

**CERTIFICATE OF SERVICE**

      I, William H. Jones II, certify that on October 11, 2016, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send notice of the electronic filing to all counsel of record.


                                              <u>/s/ William H. Jones II</u>
                                              William H. Jones II