**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>DEERE & COMPANY;<br><br>PRECISION PLANTING LLC;<br><br>and<br><br>MONSANTO COMPANY,<br><br>                    Defendants. | Civil Action No. 1:16-cv-08515<br><br>Judge Chang<br><br>Magistrate Judge Weisman |

**DEFENDANTS' PRETRIAL BRIEF**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

    A.    Industry Background ................................................................................ 3

    B.    The Parties ................................................................................................ 4

    C.    The Challenged Transaction .................................................................... 6

ARGUMENT ....................................................................................................... 7

I.      THE GOVERNMENT CANNOT ESTABLISH A PRIMA FACIE CASE. .................... 7

    A.    The Government's Alleged Product Market Is Not Well-Defined and Is Inconsistent with the Facts. ..................................................................... 7

        1.    The Government Cannot Show That the Parties' Products Compete With Each Other. ................................................................ 8

        2.    The Government Cannot Show That There Is a Differentiated Demand for Speed. ...................................................................... 9

        3.    The Government Cannot Provide the Economic Analysis Necessary to Prove a Product Market. ......................................... 11

        4.    The Government Misinterprets the Business Documents Underlying Its Alleged Market Definition. ................................... 13

        5.    The Government's Alleged Market Ignores Reasonable Substitutes. .............................................................................. 16

    B.    The Government Cannot Prove Any Reduction in Competition Because the Transaction Is Pro-Competitive. ...................................................... 18

        1.    The Government Must Show That the Transaction Will Reduce the Number of Competitors and Hence Increase Market Concentration. ...................................................................... 18

        2.    The Transaction Will Increase the Number of Competitors and Reduce Concentration in the Alleged Market. ............................. 19

            (a)    Ag Leader will replace Precision in the alleged market for high-speed precision planting equipment. ................................. 20

            (b)    CNH and AGCO will benefit from enhanced supply agreements with Deere and from Ag Leader's presence. ............ 24

CONCLUSION .................................................................................................. 25

## TABLE OF AUTHORITIES

Page

CASES

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)................................................................................7

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986)..............................................................................20

*FTC v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004) .....................................................19

*FTC v. Libbey*,
  211 F. Supp. 2d 34 (D.D.C. 2002) ..................................................19, 22

*FTC v. OSF Healthcare Sys.*,
  852 F. Supp. 2d 1069 (N.D. Ill. 2012) .................................................18

*Hospital Corp. of Am. v. FTC*,
  807 F.2d 1381 (7th Cir. 1986) ..............................................................18

*Kaiser Aluminum & Chem. Corp. v. FTC*,
  652 F.2d 1324 (7th Cir. 1981) ................................................................7

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
  354 F.3d 661 (7th Cir. 2004) ................................................................15

*Reifert v. S. Cent. Wis. MLS Corp.*,
  450 F.3d 312 (7th Cir. 2006) ................................................................11

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) ...............................................................8

*United States v. Archer-Daniels-Midland Co.*,
  781 F. Supp. 1400 (S.D. Iowa 1991) ....................................................18

*United States v. Baker Hughes, Inc.*,
  908 F.2d 981 (D.C. Cir. 1990).........................................................7, 25

*United States v. Marine Bancorporation, Inc.*,
  418 U.S. 602 (1974)................................................................................7

**STATUTES**

Clayton Act § 7, 15 U.S.C. § 18 ............................................................................ *passim*

**INTRODUCTION**

Deere & Company seeks to acquire Precision Planting LLC.  The transaction will foster enhanced competition and innovation and benefit consumers.  By combining companies with complementary research and development focuses, the transaction will increase innovation, allow for faster introduction of new agricultural products, and improve the quality of precision agricultural devices available to consumers.  The transaction will also create substantial synergies, including purchasing and distribution efficiencies, and expand the availability and output of precision agricultural products.

The government seeks to block the transaction under section 7 of the Clayton Act, arguing that the transaction would harm competition in an alleged market for what the government calls "high-speed precision planting systems."  Compl. ¶ 4.  This claim is unsupportable.  First, the government cannot prove a relevant product market as required under section 7.  The government proposes a market definition that has no clearly defined boundaries and is not based on any economically coherent foundation.  The government's proposed market is premised on a purported grower preference for planting speed, yet after months of investigation and discovery, the government cannot make any meaningful distinctions between the speed of so-called "high speed precision planting systems" and other planting systems.  Moreover, the vast majority of growers have no need to plant faster than they are currently planting.  Even the small minority of growers who would like to complete planting in fewer days have many ways to accomplish that objective, only one of which is to purchase a so-called "high-speed precision planting system."

With a proposed market definition that is so vague and confused, the government cannot meet its burden of establishing a relevant product market under any circumstances.  But the government also does not (and cannot) offer rigorous economic analysis to support the core

1

requirement of a market definition: that a hypothetical monopolist of the included products could profitably impose a small but significant price increase.

These problems with the government's market definition reflect the legal and conceptual errors on which the government's case rests. Not only does the government's market definition improperly hinge entirely on inferences from business documents (instead of on economic analysis), but the government and its expert badly misread those documents. The documents do *not* suggest, let alone establish, the existence of a "high-speed precision planting systems" market, nor do they show that a sufficient number of consumers would switch from one company's product to the other company's product in the face of a price increase on the first product to permit a profitable price increase. And once the government's strained reading of those documents is corrected, there is nothing left to the government's argument in support of its chosen product market.

The government also asks the Court to disregard critical features of the transaction that have significant relevance to competition. In particular, the government urges the Court to ignore critical agreements between Deere and Ag Leader Technology ("Ag Leader"), AGCO Corporation ("AGCO"), and CNH Industrial ("CNH"). As part of the transaction, Ag Leader, a capable and highly regarded industry participant, will receive from Deere what it needs to produce and market the Precision products. Ag Leader will market the Precision products at issue, and will thus replace Precision as an independent supplier of Precision's products in the alleged market.[1] AGCO and CNH, which currently purchase Precision products, will have continued access to Precision products under amended and enhanced supply agreements—while

---

[1] Defendants have recently entered a term sheet agreement with Ag Leader to be followed in short order by revised definitive agreements that will strengthen and enhance its ability to compete in the product lines at issue. The parties are currently negotiating a schedule for additional accelerated discovery on this issue, and hope to submit a status report or motion for a revised schedule shortly.

also gaining a new competitive alternative in Ag Leader.  CNH also will ███████████

███████████████████████████  As a result, even assuming the government's alleged

product market, these agreements will ensure that Precision will be fully replaced.

Even accepting the government's incoherent product market and ignoring the agreements

with Ag Leader, AGCO, and CNH, there will be no "substantial lessening of competition."  At

least four other companies either already sell or are poised to sell products in the alleged product

market, and these companies stand ready to replace any lost competition between Deere and

Precision.  And Deere's acquisition of Precision will also create extensive pro-competitive

efficiencies.  Therefore, the government cannot meet its burden of proving that the transaction

substantially lessens competition, and the Court should allow the transaction to proceed.

## BACKGROUND

### A.    Industry Background

Planting is one step in crop production.  Row crops are planted in rows wide enough to be

tilled, planted, and harvested using agricultural equipment.  Planters are machines used to plant

seeds for various types of row crops (*e.g.*, corn).  Uncontested Facts ¶ 8.  Planters include a

toolbar and a varying number of "row units," which are comprised of components that perform

various planting-related tasks, such as opening and closing the seed trench, as well as sorting,

depositing, and placing seeds in the trench.  Bresnahan Rpt. ¶ 19.  Row units can be configured

with many different components, including hoppers, seed delivery systems, seed meters, and

downforce systems.  Uncontested Facts ¶ 12; Bresnahan Rpt. ¶ 19.

Each of these and other components can enhance crop yield (commonly defined by

bushels harvested per acre) and reduce costs.  For example, seed meters space and separate

("singulate") each seed as it travels from the seed hopper to the seed delivery system.  Bresnahan

Rpt. ¶ 19.  High levels of singulation increase precision and are generally associated with higher

3

yields.  *Id.*  Likewise, downforce systems adjust the pressure applied to each row unit to maintain consistent contact between the soil and row unit over varying terrain.  *Id.*  Planting at consistent and optimal depths also increases precision and is generally associated with higher yields.  *Id.*

In general, growers will configure their planters based on their specific needs.  *Id.* at ¶ 20. A grower's needs can vary significantly, depending on crop choice, seed choice, terrain, soil composition, climate, field topography, tillage practices, and other factors.  *Id.*; Bresnahan Rbtl. ¶ 6.  Planters vary by the number of row units (or planter width) and by the type and range of components on each row unit.  Bresnahan Rpt. ¶ 20.  The number of row units on a planter, the type of components used, and the tractor itself can all determine how long it will take a grower to plant a field and the degree to which precision in singulation, spacing, planting depth, and other metrics can be achieved.  *Id.*

According to the government, growers focus on completing their planting within the "optimal planting window"—a time when growers' expected yields generally are higher. Compl. ¶ 1.  The optimal planting window for a particular location depends on weather and soil temperature and also varies by crop, soil conditions, and other factors.  Bresnahan Rpt. ¶ 43.  The start and the duration of the optimal planting window change each year and are difficult to predict.  *Id.*  The government contends that growers need to plant faster than they do today to complete planting within the optimal window.  Growers, however, generally will not sacrifice precision to achieve higher planting speeds.  Bresnahan Rbtl. ¶¶ 87, 99.

### B.  The Parties

Deere develops, manufactures, and sells planters, as well as a range of other agricultural equipment.  Uncontested Facts ¶ 1.  Deere introduced the ExactEmerge row unit for the 2015 planting season.  Bresnahan Rpt. ¶ 26.  The ExactEmerge row unit is comprised of a number of components, including a seed delivery system called BrushBelt, a seed bowl, a seed sensor, a

seed meter, mini-seed hoppers, dual electric motors, a downforce system, and a controller. *Id.*
¶ 27. ExactEmerge row units are controlled by the SeedStar 3 HP monitor, which is sold
separately. *Id.* ExactEmerge is sold only as a complete row unit attached to the planter toolbar,
either as an option on a new planter or, from the 2016 planting season on, as a retrofit kit that can
be installed on certain Deere planters manufactured after 2011. *Id.* In the sale of planters, Deere
competes with other manufacturers, including CNH, AGCO, Kinze, Great Plains, and Horsch.
*Id.* ¶ 28.

Precision does not manufacture or sell planters. Uncontested Facts ¶ 25. Precision
develops innovative products, including certain components for planters, to provide specific
agronomic benefits to growers. Bresnahan Rpt. ¶ 35. Among the products developed by
Precision are the four that are the focus of the government's claim: the vSet seed meter, the
vDrive electric drive, the 20/20 SeedSense control monitor, and the SpeedTube seed delivery
system. *Id.* ¶ 36. vSet is a vacuum seed meter that picks up seeds from the base of the meter and
drops them individually into a seed delivery system. *Id.* vSet is powered by vDrive, an electric
motor. *Id.* SpeedTube is a seed delivery system that uses a segmented conveyor to deliver the
seeds to the furrow. *Id.* vSet and vDrive are required in order to operate SpeedTube, but can
also be used with other types of seed delivery systems. *Id.*; Uncontested Facts ¶ 17. 20/20
SeedSense is a monitor that sits in the cab of the tractor. Bresnahan Rpt. ¶ 36. It allows the
grower to control the planter's components and displays data generated by the various
components related to planting precision and other performance metrics. *Id.* vDrive, vSet and
SpeedTube may be used with control monitors other than 20/20 SeedSense. *Id.*

Precision sells vDrive, vSet, SpeedTube and 20/20 SeedSense separately. *Id.* ¶ 37;
Uncontested Facts ¶ 19. Since January 2015, Precision's unit sales of vSet meters have been five

times the unit sales of SpeedTube. Bresnahan Rpt. ¶ 37. Unlike ExactEmerge (which can only be used on certain Deere planters), vDrive, vSet, SpeedTube and 20/20 SeedSense can be used on a wide range of planters manufactured by Deere, Kinze, AGCO, and CNH. *Id.* ¶¶ 38-39; Uncontested Facts ¶ 20.

### C. The Challenged Transaction

The challenged transaction consists of multiple agreements. In November 2015, Deere agreed to acquire Precision for $190 million, subject to a carve-out of some assets and adjustments. Uncontested Facts ¶ 4. Deere seeks to acquire Precision to expand its retrofit capabilities across a wide product range and to gain a proven team of equipment innovators with experience in moving projects quickly from concept to the field. Dkt. 236, Exs. B-C.

The transaction also includes the agreements, all contingent on Deere's acquisition of Precision, between Deere and (i) Ag Leader, (ii) CNH, and (iii) AGCO. Bresnahan Rpt. ¶¶ 17, 145; CASE-00301564; JD-000432227; JD-000432233. Deere's agreement with Ag Leader provides Ag Leader the ability to make and sell competing versions of vSet, vDrive, and SpeedTube, ███████████████████████████████████████████████ Bresnahan Rpt. ¶¶ 17, 40, 50. The agreement aims to enable Ag Leader to become an independent, efficient, and effective seller of Precision's products. *Id.* ¶¶ 17, 40, 50, 200.

Deere also has committed to CNH and AGCO that it will amend their existing agreements with Monsanto and Precision such that, among other things, CNH and AGCO ███ ██████████████████████████████████████████████████████████ ███████████████████████████████████████ *Id.* ¶ 17; CASE-00301564; JD-000432227. Deere has further committed to, among other things, ███████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ Bresnahan Rpt. ¶ 17, 50; CASE-00301564; JD-

000432227.  Deere also will grant to CNH ███████████████████████████████

████████████████████████ JD-000432233.

# ARGUMENT

Section 7 of the Clayton Act prohibits mergers where the effect of the transaction "may be substantially to lessen competition" in a "line of commerce."  15 U.S.C. § 18.  There must be a "reasonable likelihood" of substantial competitive harm; mere "possibilities" will not suffice. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622-23 (1974).  The first step in any Section 7 case is to define the relevant market allegedly threatened by the transaction.  *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1329 (7th Cir. 1981).  The second step is to show that the acquisition is likely to harm competition substantially in that market.  *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982 (D.C. Cir. 1990).  The government must prove the existence of a relevant market, *Marine Bancorporation*, 418 U.S. at 618, and bears the ultimate burden of persuasion on its Section 7 claim, *Baker Hughes*, 908 F.2d at 983.

## I.    THE GOVERNMENT CANNOT ESTABLISH A PRIMA FACIE CASE.

### A.    The Government's Alleged Product Market Is Not Well-Defined and Is Inconsistent with the Facts.

A product market defines the boundaries within which competition meaningfully exists among specific products.  The "boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  An alleged product market is too narrow if it excludes reasonable substitutes.  *See Kaiser Aluminum*, 652 F.2d at 1330.  A market includes products with varying qualities and characteristics, so long as they are "easily substituted in their end-use." *Id.*  Demand substitution is key to defining an antitrust market because "the ability of consumers to turn to other suppliers restrains a firm from

raising prices above the competitive level." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986).

The government claims a product market for "high-speed precision planting systems," which the government says require four distinct planter components: an "advanced" seed meter, an electric drive, an "advanced" seed tube, and a control monitor. Compl. ¶¶ 14, 26. The government alleges that Precision participates in this relevant market through sales of a hypothetical bundle comprised of SpeedTube, vSet, vDrive, and SeedSense 20/20. Chipty Rpt. ¶ 23. In reality, consumers purchase these components separately. With respect to Deere, the market allegedly includes the ExactEmerge row unit, whether installed onto a new planter or retrofitted. The two alleged "products" are priced at significantly different levels: an ExactEmerge planter typically is priced at $199,000-$291,000; an ExactEmerge retrofit row unit is priced at $66,100 to retrofit a Deere 1770NT 16 row planter; and the combined price for Precision's four components (although sold and priced separately) is $40,900 to retrofit the 1770NT 16 row planter. Bresnahan Rpt. ¶¶ 125, 129, Exs. 17, 18.

Indeed, Dr. Tasneem Chipty, the government's economic expert, concedes that the Deere and Precision products at issue are very different from each other in price, compatibility, features, and grower demand. Chipty Dep. at 151:18-152:12, 182:9-13; Chipty Rbtl. ¶¶ 20-24. The government's alleged market thus includes two radically different sets of products but excludes other comparable products, and is implausible on its face and incoherent in its application.

> **1. The Government Cannot Show That the Parties' Products Compete With Each Other.**

For many customers, ExactEmerge and Precision's products are not close substitutes. Customers can purchase ExactEmerge either as an option on a new planter or as a retrofit kit for

certain Deere planters. The ExactEmerge row unit contains only three of the four components that comprise the alleged relevant market; it lacks the control monitor, SeedStar 3 HP, which is in the cab of the tractor. Chipty Rpt. ¶ 23; Chipty Dep. at 55:7-12. By comparison, Precision sells only separate components that are priced and sold individually and either factory-installed or retrofitted onto certain planters. Chipty Rpt. ¶ 23; Chipty Dep. at 31:10-24, 34:18-22. These components face different competitors and demand levels. Chipty Rbtl. ¶ 70; Chipty Dep. at 45:4-14.

While Precision's products may be used on a wide range of planters manufactured by various companies, the ExactEmerge retrofit kit is compatible only with three Deere models manufactured from 2011 to the present. Bresnahan Rpt. ¶ 10, Ex. 5. The ExactEmerge retrofit kit is priced at parity with the ExactEmerge row unit option on new planters, *id.* ¶¶ 147-49, meaning that growers are likely to purchase ExactEmerge kits only for planters predating the introduction of ExactEmerge. This in turn means that, even assuming any direct competition between the ExactEmerge retrofit kit and the hypothetical Precision bundle, it necessarily is small. *Id.* ¶ 55; Chipty Rbtl. ¶ 75, Ex. 7b.

### 2. The Government Cannot Show That There Is a Differentiated Demand for Speed.

The government must show that the parties' products are substitutes for each other and that other substitutes are insufficient to constrain pricing. The government defined a market around planting speed and emphasized in its complaint and discovery responses the ability to operate the planter "at speeds materially greater than 5 mph (dependent on conditions) without materially losing accuracy of seed placement." Answer to Rog 1 pg 20; *see also* Compl. ¶ 15. In reality, however, many growers currently plant faster than 5 mph with their current "conventional planters." *See* Bresnahan Rbtl. ¶¶ 111-117 (some "conventional planters" plant

9

faster than 5.5 mph, and some "high-speed" planters plant slower than 5 mph); Chipty Rpt. Ex. 9 (nearly 50% of the acres planted by "conventional planters" in the reported data were planted at speeds at or above 5 mph).

Most growers, moreover, do not need to plant faster to complete planting in the optimal window, given the sizes of their farms. *See* Bresnahan Rbtl. ¶¶ 90-94. Based on agronomic data and third-party studies, Dr. Bresnahan shows that the optimal planting window is typically about 12 days. *See id.* at 74 n.289. If the government were right that growers need to plant faster in order to meet that window, then the agronomic data would show many growers taking longer than 12 days to plant their crops. However, the data show the opposite—less than 5% of the total acres planted in 2015 and 2016 were planted outside of that 12-day window. *See id.* ¶ 94. ■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■ *See id.* ¶¶ 101-107; KELLGRP-ATR-00000041 at KELLGRP-ATR-00000050, KELLGRP-ATR-00000107, KELLGRP-ATR-00000126, KELLGRP-ATR-00000131-32.

Instead of assessing whether growers have a differentiated (*i.e.*, unique and independent) demand for speed, the government and its expert have simply assumed this to be the case, based on the testimony of two growers, *see* Chipty Rpt. ¶ 54, and performed a series of analyses that concluded, unremarkably, that growers with SpeedTube-equipped planters plant, on average, about one mph faster than growers with planters not equipped with SpeedTube. Chipty Rpt. ¶¶ 56-61. But this regression analysis—the only econometric analysis in Dr. Chipty's report—is irrelevant to whether growers have a *differentiated* demand for speed. Dr. Chipty tested the wrong thing: she tested whether growers who used "high-speed precision planting" technology planted faster than those who did not. *Id.* ¶ 59. This is irrelevant to the issue of market

definition; increased planting speed could be a byproduct of growers' investment in technology that improves planting precision, as both ExactEmerge and Precision's products can enhance planting precision at *any speed.* Bresnahan Rbtl. ¶¶ 62, 87, 116. Dr. Chipty's analysis fails to distinguish a hypothetical demand for speed from demand for precision. *Id.* Moreover, the data on which Dr. Chipty relies show that many growers who do not use SpeedTube plant faster than growers who do. *Id.* ¶ 116. This suggests that factors other than speed likely contribute to the ability to plant faster. Yet Dr. Chipty's analysis did not control for any confounding factors that could alternatively explain her observation, such as differences in weather, terrain, or tractor horsepower.

### 3. The Government Cannot Provide the Economic Analysis Necessary to Prove a Product Market.

The government's proposed product market is also legally defective because it lacks the necessary economic foundation. This alone is dispositive, regardless of the other problems with the government's claim. In this circuit, "the plaintiff must provide an economic analysis of the relevant market." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006). The Seventh Circuit "requires that a plaintiff prove that products are good substitutes using economic evidence; a conclusory assumption of competition where products or services appear to be similar is insufficient." *Id.* at 318. Typically, a relevant product market is proven through the "hypothetical monopolist test," which measures whether a hypothetical monopolist selling all of the products in a candidate market could profitably impose a "small but significant and non-transitory increase in price" (a "SSNIP"). *See* DOJ & FTC, Horizontal Merger Guidelines § 4.1.1 (2010).[2]

---

[2] If a SSNIP would not be profitable (because too many customers would switch to other products outside the candidate market), the candidate market is too narrow. *Id.* §§ 4.1.1, 4.1.2. The Guidelines state that a SSNIP

Dr. Chipty relied entirely on a small group of internal Deere documents to support her view that "*Deere personnel determined* that, absent the proposed acquisition, competition from Precision's SpeedTube would likely force Deere to lower the price of its ExactEmerge row unit" by 5-15%. Chipty Rpt. ¶ 106 (emphasis added). Simply accepting this hypothesis (instead of validating it), Dr. Chipty tautologically observed that such a 5-15% price effect would meet the definition of a SSNIP. She further claimed based on these documents, but without any analysis, that the merged company could profitably avoid such a price effect. *See id.* ¶ 107 ("*Based on this information*, a hypothetical monopolist over the two high-speed precision planting systems made by Deere and Precision Planting would find it profitable to raise the price of Deere's high-speed precision planting system by a small, but significant non-transitory amount above the price level that would have prevailed absent the merger.").[3] Under controlling Seventh Circuit law, that simply does not suffice.

Dr. Chipty admitted at her deposition—consistent with guiding Seventh Circuit principles—that "[c]ompany documents and ordinary course behavior" must be "*coupled with economic analysis*" in order to "provide sufficient basis for an economic opinion." Chipty Dep. at 22:12-15 (emphasis added). Yet she conceded that Deere's business documents "were the source of the data that [she] used to formally implement the hypothetical monopolist test." *Id.* at 237:13-18; *see also id.* at 238:16-22 (agreeing that these documents were "central support" for her hypothetical monopolist test). She freely admitted that she "didn't look at numerical data" in

---

analysis is an important "methodological tool for performing the hypothetical monopolist test." *Id.* § 4.1.1; Chipty Rpt. ¶ 92 (the hypothetical monopolist test should employ SSNIP analysis).

[3] In a footnote of her report, Dr. Chipty arithmetically derives the percentage of sales that would need to divert from the ExactEmerge row unit to Precision's SpeedTube to support a hypothesized 10% price increase, a calculation that she describes as "implied by" her assumption of a post-merger price increase based on the cited business documents. *Id.* n.246. Such an arithmetic exercise, however, does not economically evaluate how consumers would *actually* respond to a hypothetical price increase on the ExactEmerge row unit, including the extent to which consumers would divert to the merged company's SpeedTube in the event of hypothetical SSNIP—which is the economic analysis that Dr. Chipty should have performed.

order "to validate the 5 to 15 percent assumption in those documents"—*i.e.*, by arriving at "an alternative estimation" of the figure using an econometric model. *Id.* at 247:12-18, 249:19-22. Dr. Chipty conceded that she "did not econometrically estimate demand" in order to predict how consumers would respond to a price increase. *Id.* at 257:23-24, 323:20-324:17. Simply put, Dr. Chipty did not perform any independent assessment validating the assumption she draws from these business documents. *See, e.g.*, *id.* at 251:13-252:17 ("I don't have any information outside of the set of documents that I cite" supporting the 5-15% range.).

In short, Dr. Chipty failed to conduct a SSNIP analysis, or any other economic analysis of price sensitivity, to support her conclusions on market definition. To be sure, she used SSNIP-type language, opining that "a hypothetical monopolist over the . . . Deere and Precision Planting [technologies] would find it profitable . . . to raise prices by five to fifteen percent." Chipty Rpt. ¶ 107. But she never actually conducted any economic analysis *deriving* the conclusion that a hypothetical monopolist could profitably impose such a price increase.

### 4. The Government Misinterprets the Business Documents Underlying Its Alleged Market Definition.

Dr. Chipty's *de facto* delegation of the government's responsibility to economically test the contours of the relevant market to a group of Deere employees is also improper because Dr. Chipty misinterpreted the documents she relies upon, which do not constitute an economic analysis and do not address the post-closing market dynamics. These documents mostly state or suggest the same thing: that some Deere personnel almost two years ago appeared to express some concern about possible competition from Precision products. One such document, an internal product summary for a new "high performance row unit," opined about "competitive planter pressure" from Precision. JD-000339722. Another states that "Precision is a tough competitor as they are pricing for value capture in a different arena than we are," and that Deere

"need[ed] to be aware of that." JD-000030727. None of these documents actually quantify the volume or value of sales hypothetically lost to Precision, the diversion data that would be relevant to defining the market.

Devoid of real evidence setting the scope of a product market, the government treats these various documents as dispositive of the product market inquiry. But on their face these documents do not answer the question required by the product market analysis. At most, they merely reflect some employees' belief that Precision's SpeedTube component competes to some extent with one element of Deere's ExactEmerge products (planters and row units, neither of which Precision manufactures or sells), notwithstanding the significant difference in prices, features, and compatibility among ExactEmerge planters, ExactEmerge row units, and Precision's four components, and that Deere's retrofitting solution works only on certain late-model Deere planters.

Nor do these documents suggest that no other products or solutions compete with the Deere and Precision products. This is critical, because the government must not only establish whether the market *includes* Precision, but also must identify the market's *boundaries* (*i.e.*, which firms and products are outside the market). Otherwise, there is no way to know whether a hypothetical monopolist of the Deere and Precision products in isolation could impose a profitable SSNIP. The business documents in fact indicate to the contrary that the government's alleged market is too narrow. *See, e.g.*, JD-000339722 (noting that ExactEmerge's market includes, *inter alia*, "Kinze," "CNH," "White," and "Great Plains"); JD-000030727 (noting competition with Case). And other documents support a conclusion that ███████████

████████████████████████████████████████

14

███████████████████████████████████████  KELLGRP-ATR-

00000041; DX-440, MON-LIT-000238926 at -978.

Similarly, Dr. Chipty claims that a handful of documents demonstrate that Deere would

need to drop the price of ExactEmerge by 5 to 15 percent if it were not to acquire Precision. But

those documents do not discuss actual pricing strategy or practices. There is no evidence that

Deere actually planned to reduce the price of ExactEmerge to compete with Precision. In fact,

the price of ExactEmerge has not fallen in the almost two years since these documents were

written. Rather, Deere *increased* ExactEmerge's price following Precision's entry. Bresnahan

Rbtl. n.378.

Nor do the documents indicate that the supposed potential for a 5-15% price drop was the

product of any sort of quantitative analysis. The documents instead reflect a rough, offhand

estimate from a single Deere employee, who explained that the range was just "a guess from me"

and not generated by any "analysis that would show the five to 15" percent figure. Meskan CID

Dep. at 166:16-23, 181:17-18. It thus makes no sense for Dr. Chipty to "place a lot of

confidence" in these internal documents, as if "the personnel involved" at Deere "ha[d] actually

implemented a version of the hypothetical monopolist test." Chipty Dep. at 242:24-243:6,

249:23-250:4. There is not the remotest evidence that the drafters even knew what the

hypothetical monopolist test *is*, let alone that they were thinking of anything like it in writing

these documents. And of course, such amateur "armchair economics" (even if attempted) could

not replace the "econometric analysis" that is necessary when the government seeks to block a

merger under the Clayton Act. *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661,

664 (7th Cir. 2004).

### 5. The Government's Alleged Market Ignores Reasonable Substitutes.

Had the government attempted to provide the required economic foundation for the alleged market, it would have faced the fatal hurdle of justifying the exclusion of reasonable substitutes for the parties' products. First, the government assumes that growers are uniquely concerned with planting during the optimal window. Second, the government assumes that growers uniquely seek to complete planting within the optimal window by planting faster. But it has no proof of either.

Regarding the first assumption, it is certainly true that growers derive value from planting within the optimal window to the extent they can increase their yield by doing so. Bresnahan Rpt. ¶ 63. Many growers, however, are already able to plant within the optimal planting window given the size of their farms and the nature of their existing equipment and operations. *Id.* And in any event, there are many ways to increase yield, both during planting and at other phases of the crop cycle. *Id.* The government does not—and cannot—explain why growers would be uniquely concerned with increasing yield by planting within the optimal window, when many growers are already able to do so and where there are other means of increasing yield that may be more economically advantageous. *Id.* For example, growers can increase yield with a wide array of products, like downforce systems (offered by Ag Leader, Amazone, Dawn, Deere, Horsch, Kinze, Lemken, Precision, and Shoup) or guidance and steering systems (offered by Ag Leader, Trimble, CNH, Kinze, and Raven). *Id.* Ex. 8. Growers can also increase yield by planting for more hours in the day, by using more planters, or by having a wider planter. *Id.*

In discovery, the government presented no examination of grower substitution across the products in its relevant market and those products the alleged market excludes. *Id.* ¶ 70. Instead, the government relied on statements in the parties' marketing materials calling their products "game changers" and "revolutionaries"—but marketing does not demonstrate how buyers

16

perceive a product. *Id.* Dr. Chipty, moreover, rejected various alternative products and strategies based on anecdotal evidence. Chipty Rpt. ¶ 62. For example, Dr. Chipty sweepingly concludes that wider planters are not a substitute for "high-speed precision planting systems" based on nothing more than a few business documents, an exhibit showing the number of Deere planters sold by number of row units, and pure guesswork. *Id.* She admits that "some growers . . . may find it economical to switch to a wider planter" before excluding this potential substitute from her product market on the vague proposition that "at some point, going wider is not a good alternative." *Id.* Similarly, Dr. Chipty concludes that "growers are already working longer hours" based on one Deere business document and the testimony of two growers. *Id.* However, this is a testable proposition for which she had the necessary data—indeed, Professor Bresnahan analyzed Precision's agronomic data and found that, contrary to Dr. Chipty's conclusion, growers have significant capacity to work longer hours. *See* Bresnahan Rpt. ¶ 108.

Compounding its errors, the government also failed to analyze competition for the various Precision components, which are sold separately and face individualized competition. *See* Chipty Dep. at 44:14-46:11. While both the government and Dr. Chipty were aware that other companies offer (i) monitors that compete with 20/20 SeedSense, (ii) seed meters that compete with vSet, and (iii) electric drives that compete with vDrive, Dr. Chipty did not analyze whether, post-acquisition, Deere could raise the price of either vSet, vDrive, or 20/20 SeedSense. *Id.* at 45:4-46:11, 48:24-49:5. Dr. Chipty admitted that, even though that Precision sells its components separately, "the analysis that I have done and the work that I have presented is about the effects of the merger on the bundle of technologies that enable high-speed precision planting." Chipty Dep. at 47:13-16. Simply put, the government failed to analyze whether growers could substitute products produced by third parties for three of the four components

which comprise its relevant product market.

**B.    The Government Cannot Prove Any Reduction in Competition Because the Transaction Is Pro-Competitive.**

Even if the government had proof for its relevant product market, the facts will show the merger would not reduce the number of competitors and would not produce a firm controlling an "undue percentage share of the relevant market." *Gen. Dynamics*, 415 U.S. at 497. The transaction includes agreements with Ag Leader, CNH, and AGCO that *increase* competition. Ag Leader will acquire the ability to manufacture and sell competing versions of Precision's vSet, vDrive, and SpeedTube. ██████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
██████████████████████████████████████

**1.    The Government Must Show That the Transaction Will Reduce the Number of Competitors and Hence Increase Market Concentration**

To establish a *prima facie* case based on market-concentration statistics, the government must show that the merger will reduce the number of significant firms competing in that market. *See Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1387 (7th Cir. 1986). In *Hospital Corp.*, the challenged "acquisitions reduced the number of competing hospitals in the … market from 11 to 7." *Id.* "The reduction in the number of competitors is significant," the court said, because "the fewer competitors there are in a market, the easier it is for them to coordinate their pricing" or otherwise avoid competition. *Id.* That principle is well-established and frequently applied. *See, e.g.*, *United States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1421 (S.D. Iowa 1991) (presumption "is based on the rationale that a reduction in the number of competitors" can create anticompetitive effects); *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1083 (N.D. Ill. 2012) (enjoining transaction because it "lessen[ed] the number of competitors from three to

two"). Thus, a transaction that maintains or increases the number of significant competitors in the alleged market cannot be presumed to substantially lessen competition. *See FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 124 (D.D.C. 2004).

Determining whether a transaction increases the concentration of firms in an alleged market requires analysis of the transaction as a whole, including any associated agreements that will increase competition. *See, e.g.*, *FTC v. Libbey*, 211 F. Supp. 2d 34, 45 (D.D.C. 2002). In *Libbey*, for example, the merger agreement provided that the acquired company would divest its "food service glassware business" to a third company. *Id.* The court required the FTC to provide affirmative evidence that the entire transaction—including the divestiture—would reduce competition. *Id.* at 47. Similarly, in declining to enjoin the merger in *Arch Coal*, where the market had "five significant producers," the court noted that due to a divestiture, "[p]ost-merger, there will still be five significant producers." 329 F. Supp. 2d at 124.

### 2. The Transaction Will Increase the Number of Competitors and Reduce Concentration in the Alleged Market.

There will be no increase in concentration following this transaction: it is structured to ensure that there will be more competition after the transaction than today. Through the agreements with Ag Leader, the transaction will leave the number of competitors exactly where it is today, and Ag Leader will fully step into Precision's shoes. *See Arch Coal*, 329 F. Supp. 2d at 124. Ag Leader, a well-established precision agriculture equipment firm, will acquire the ability to manufacture Precision's SpeedTube, vSet, and vDrive, allowing Ag Leader to replace any competition that may exist between Precision and Deere. Bresnahan Rpt. App. 2 ¶ 1. The transaction also ███████████████████████████████████████████████████

███████████████████████████████████████████████[4] *Id.* ¶ 188.  As a result, the transaction will leave the number of competitors unchanged.  Moreover, both CNH and Ag Leader have strong incentives to innovate the next generation of planting technology, since Precision ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████

### (a)  Ag Leader will replace Precision in the alleged market for high-speed precision planting equipment.

The transaction includes an agreement authorizing Ag Leader "to make and sell competing versions" of Precision's SpeedTube, vSet, and vDrive.  Bresnahan Rpt. App. 1 ¶ 1.  Ag Leader already manufactures its own monitor, the InCommand 1200, that can be used with Precision's products.  Bresnahan Rbtl. ¶ 28; Myers Dep. 120:13-121:7.  The parties have gone to great lengths to ensure that Ag Leader has the ability and incentive to compete.  ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████  Bresnahan Rpt. App. 1 ¶ 1.  The evidence at

---

[4] The facts will show that while CNH triggered the DOJ challenges based on initial concerns about a supply relationship, CNH today stands merely as a competitor upset with a transaction on the basis that it will increase competition.  Concerns with "increased competition" are not cognizable under the antitrust laws.  *See, e.g.*, *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986).

trial will amply demonstrate that Ag Leader has what it needs to compete immediately and vigorously to sell the relevant Precision components.  In Ag Leader's own words, the company

██████████████████████████████████████████████████████████████

██████████████████████  Ag Leader Bus. Dev. Plan 2 ("Plan"); *see* Zeilke Dep. at 120:10-16; 177:19; Myers Dep. at 39:21-40:2.

**First,** Ag Leader, like Precision, is a successful and proven supplier of precision agricultural products.  Bresnahan Rpt. App. 2 ¶ 5.  Founded in 1992, Ag Leader ████████████

██████████████████████████████████████████████████████████

██████████████████████████  *Id.* ¶ 6.  ██████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████  Plan 5, 14.  The company designs, tests, manufactures, sells, and supports a broad portfolio of precision agriculture products, including products designed to increase planting performance, such as an advanced monitor, a hydraulic downforce control system, and variable rate planting tools.  Bresnahan Rpt. App. 2 ¶¶ 7-8.  The company has an extensive history of innovation and helped pioneer the precision farming industry.  Myers Dep. 101:4-5 ("pioneer of yield monitors"); Zielke Dep. 170:7-19; Plan 4.  It introduced the industry's first yield monitor in 1992 and now sells an advanced monitor that can already function with Precision's SpeedTube, vSet, and vDrive.  Bresnahan Rpt. App. 2 ¶ 5; Bresnahan Rbtl. ¶ 28; Plan 4.  Having sold innovative and high-quality products for decades, Ag Leader has built strong brand recognition and a stellar reputation in the precision agriculture industry.  Bresnahan Rpt. App. 2 ¶¶ 9-12.  A recent independent survey placed Ag Leader as the top brand in precision agriculture.  *Id.* ¶ 11.

***Second***, Defendants will present at trial Ag Leader's detailed business plan to compete aggressively for sales of high-speed planting products ████████████████████ *See* Plan; Zielke Dep. at 95:17-96:9. ████████████████████████

████████████████████████████████████

████████████████████████ Plan 26. ██████████████████████

████████████████████████████████████

████████████████████████████████████

████ *See* Plan Apps. 1-5. ██████████████████████████

██████████████████████████████████ *See* Zielke Dep. at 99:11-101:4; Plan 23; Bresnahan Rbtl. ¶¶ 27-28.  Compare this to the proposed licensing agreement rejected in *United States v. Franklin Elec. Co.*, where the licensee had "no formal business plan" for competing in the relevant market and had "not undertaken any written analysis of the costs it could expect to incur" to compete in the market.  130 F. Supp. 2d 1025, 1031 (W.D. Wis. 2000).  And compare it to the business plan rejected in *FTC v. Sysco Corp*, which projected "to achieve less than *half* of [the company analogous to Precision's] current national customer sales in five years."  113 F. Supp. 3d 1, 49 (D.D.C. 2015).  Unlike in *Franklin* and *Sysco*, Ag Leader is well-positioned to compete immediately and substantially.

***Third***, Ag Leader ████████████████████████████████

████████████████████████ Bresnahan Rpt. App. 1 ¶ 1; Bresnahan Rbtl. ¶ 29.  So the costs of manufacturing ████████████████████████ This case is unlike *Libbey*, then, in which a divestiture would not sufficiently preserve competition because the defendants' "outsourcing proposal . . . would result in increased production costs."  211 F. Supp. 2d at 48. ████████████████████████████████████

████████████████████████████████████████████████████

████ Plan at 26; Myers Dep. at 98:12-22, 222:14-223:8.

**Fourth,** Ag Leader has sufficient rights and engineering capacity for future innovation.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Bresnahan Rbtl. ¶ 33.[5] ██████████████████████████████████

████████████████████████████████████████████

████ Ag Leader also has a long history of innovation, underscored by its own planting monitor that it already has integrated for use with SpeedTube, vSet, and vDrive. Bresnahan Rbtl. ¶ 28; Zielke Dep. at 120:13-121:7.

**Fifth,** Ag Leader is already primed to reach a large customer base because it has an existing dealer network similar in size to Precision's. This includes "378, 250, and 293 Ag Leader dealers in the in the U.S., Corn Belt, and Midwest regions, respectively," compared to 343, 270, and 305 for Precision. Bresnahan Rbtl. ¶ 32. The government arbitrarily attempts to limit this count to Ag Leader's "Blue Delta" dealers, but Ag Leader plans to sell the relevant products "through its entire dealer network." *Id.* In contrast, Precision sells its SpeedTube and other components only through its "Premier" and "Premier Elite" dealers. *Id.* ¶ 32 n.78.

**Sixth,** Ag Leader has every incentive to compete and to succeed. In fact, the "project represents a highly attractive opportunity for Ag Leader," one that Ag Leader expects will provide a ███████████████████████████████████████ Plan 26. And

███████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.*

---

[5] Anyway, Precision has no new products in its pipeline to supplant the licensed products. *See* Chipty Dep. 282:10-19.

This case thus satisfies the requirements of *Franklin*, where the court rejected a licensing proposal because the new company had another higher-priority product it sought to develop, combined with "limited financial resources, and small staff," so it was "inevitable" that the company would "direct its resources toward that project" instead of trying to compete using its newly acquired license. *Franklin Elec. Co.*, 130 F. Supp. 2d at 1033.  Ag Leader, in sharp contrast, ███████████████████████████████████████████████████

████████████████ Plan 2; Chipty Dep. at 296:23-297:2.

> **(b)    CNH and AGCO will benefit from enhanced supply agreements with Deere and from Ag Leader's presence.**

CNH and AGCO, which currently purchase Precision's products for installation on new planters, have already been offered amended licensing and supply agreements, giving them more supply options after the merger, not fewer.  Bresnahan Rpt. ¶ 50.  For CNH, ████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ Bresnahan Rbtl. Ex. 2.

For AGCO, ██████████████████████████████████████

██████████████████████████████████████████████



██████████████████ Bresnahan Rpt. App. 1 ¶ 3. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ Bresnahan Rbtl. Ex. 2.  The deal thus increases the number of suppliers

for both CNH and AGCO and increases competition in the alleged market.  Bresnahan Rpt. ¶ 54.

The government wrongly claims that the merged firm will lack an incentive to supply

CNH and AGCO and to innovate with respect to those products.  *See* Chipty Rpt. ¶¶ 148-53.  But

Ag Leader will compete with the merged firm.  Also, CNH █████████████████

█████████████████████ The deal ██████████████████ for CNH and

AGCO.  *Id.* ¶ 40.  With regard to future products and innovation, the government ignores CNH's

available resources as a multi-billion dollar enterprise, along with CNH and AGCO's success in

bringing agricultural products to market.  *Id.* ¶¶ 39, 41-44.  CNH will have the capability and the

incentive to innovate—on its own and with Ag Leader—███████████████████

██████████████ *Id.* ¶ 43.[6]

## CONCLUSION

Judgment should be entered for Defendants.

---

[6] Even if the Government could establish a *prima facie* case, Defendants will rebut any presumption of illegality with evidence of "entry" by new competitors and merger-specific "efficiencies."  *Baker Hughes*, 908 F.2d at 22.  **First,** post-merger, several competitors would be likely to enter or reposition themselves if the merged firm raised prices.  Ag Leader of course will immediately replace Precision, ████████████████████████████████ ████████████████████████████████████████████████████████
Bresnahan Rpt. ¶¶ 186-88, 191.  Also, Kinze is the number two seller of planters in the U.S. and sells planters with a working speed of up to 8 mph.  *Id.* ¶¶ 189-90.  Finally, Horsch introduced its Maestro SW planter in the U.S. in 2013, and advertises a planting speed of up to 8 mph.  *Id.* ¶ 192-94.  **Second,** the merger will create synergies between the different innovation approaches of Deere and Precision, *id.* ¶¶ 218-22, it will enable Deere's dealer network to expand sales opportunities for Precision's products, *id.* ¶ 223-29, and it will create purchasing and distribution efficiencies, *id.* ¶ 230, all of which will ultimately benefit consumers.

Dated: April 10, 2017

Respectfully submitted,

/s/ John M. Majoras

Ronald S. Safer (6186143)
Patricia Brown Holmes (6194645)
Matthew J. Fischer (6224916)
Valarie Hays (6272380)
RILEY SAFER HOLMES & CANCILA LLP
Three First National Plaza
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
Ph: (312) 471-8700
rsafer@rshc-law.com
pholmes@rshc-law.com
mfischer@rshc-law.com
vhays@rshc-law.com

**_Counsel for Defendant_**
**_DEERE & COMPANY_**

John M. Majoras (admitted _pro hac vice_)
Michael S. Fried (admitted _pro hac vice_)
Debra R. Belott (admitted _pro hac vice_)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone:  (202) 879-3939
Facsimile: (202) 626-1700
jmmajoras@jonesday.com
msfried@jonesday.com
dbelott@jonesday.com

Paula W. Render (Bar. No. 6237954)
JONES DAY
77 West Wacker Drive
Chicago, IL 60601-1692
Telephone:  (312) 782-3939
Facsimile: (312) 782-8585
prender@jonesday.com

Thomas Demitrack (admitted _pro hac vice_)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
tdemitrack@jonesday.com

Roxann E. Henry (admitted _pro hac vice_)
Jonathan S. Gowdy (admitted _pro hac vice_)
David D. Cross (admitted _pro hac vice_)
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:     (202) 887-1500
Facsimile:     (202) 887-0763
RHenry@mofo.com
JGowdy@mofo.com
DCross@mofo.com

/s/ Paul H. Friedman

Paul H. Friedman (admitted _pro hac vice_)

Brian Rafkin (admitted *pro hac vice* )
DECHERT LLP
1900 K Street, NW
Washington, D.C. 20006
Telephone:  (202) 261-3300
Paul.Friedman@dechert.com

Michael L. Weiner (admitted *pro hac vice*)
Morgan J. Feder (admitted *pro hac vice*)
Samuel Stelk (admitted *pro hac vice*)
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 698-3608
Michael.Weiner@dechert.com

Barbara H. Wootton (admitted *pro hac vice*)
Wrede Smith (admitted *pro hac vice*)
Francesca Pisano (admitted *pro hac vice*)
ARNOLD & PORTER LLP
601 Massachusetts Avenue, NW
Washington, D.C. 20001
Telephone:  (202) 942-5000
Barbara.Wootton@aporter.com

George C. Lombardi (6187715)
Brett A. Walker (6314212)
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Telephone:  (312) 558-6445
glombard@winston.com

***Counsel for Defendants***
***MONSANTO COMPANY***
***and PRECISION PLANTING LLC***

## <u>CERTIFICATE OF SERVICE</u>

I, John M. Majoras, certify that on April 10, 2017, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send notice of the electronic filing to all counsel of record.

<u>/s/ John M. Majoras</u>
John M. Majoras