**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | Civil Action No. 1:16-cv-08515 |
| v. | Judge Chang |
| DEERE & COMPANY; | Magistrate Judge Weisman |
| PRECISION PLANTING LLC; | **<u>Public Redacted Version</u>** |
| and | |
| MONSANTO COMPANY, | |
| *Defendants*. | |

**<u>UNITED STATES' PRETRIAL MEMORANDUM</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

ARGUMENT .................................................................................................................... 9

    A.    The Relevant Market. ...................................................................................10

        1.    High-Speed Precision Planting Systems Is a Relevant Product Market. ....................10

        2.    Defendants' Arguments Fail To Undermine the Proposed Product Market. ...............14

    B.    The Proposed Acquisition Is Presumptively Illegal Under Section 7 Because the Combined Firm Would Control an Undue Share of a Highly Concentrated Market. ....15

    C.    The Elimination of Head-to-Head Competition Between Deere and Precision Planting Is Likely To Harm Farmers. ..............................................................17

    D.    Neither Entry nor Expansion Will Ameliorate the Likely Anticompetitive Effects of the Proposed Acquisition. ................................................................19

    E.    No Efficiencies Will Outweigh the Likely Anticompetitive Effects of the Proposed Acquisition. ...............................................................................20

    F.    Defendants' Proposed Remedy Will Not Restore the Competition Extinguished by the Proposed Acquisition. .......................................................21

        1.    Modifying Contracts Leaves CaseIH and AGCO Dependent on Deere. ....................22

        2.    Defendants' Agreement with Ag Leader Does Not Remedy the Proposed Acquisition's Likely Anticompetitive Effects. ..........................................22

CONCLUSION................................................................................................................ 25

i

## **TABLE OF AUTHORITIES**

**CASES:**

*Beatrice Foods Co. v. FTC*, 540 F.2d 303 (7th Cir. 1976) ........................................................... 15

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ..................................................... 9, 10, 12

*Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410 (5th Cir. 2008) .......................................... 9, 19

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972)................................................................. 22

*FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016)............................. 9, 10, 11

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) .......................................... 20, 24

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ............................................................. 9

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ..................................................... 15, 16, 21

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) ............................................................. 12

*FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069 (N.D. Ill. 2012) ............................. 11, 16, 21

*FTC v. ProMedica Health Sys., Inc.*, No. 3:11-CV-47, 2011 WL 1219281 (N.D. Ohio
  Mar. 29, 2011).........................................................................................................................12

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) (*Staples II*) .................................. 18, 22

*FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) (*Staples I*).................................... 12

*FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000).................................................. 19, 24

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015).......................................................... passim

*Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2 (1984)..................................................................... 10

*Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312 (7th Cir. 2006) ............................................. 12

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ............................................................. 12

*United States v. Aetna Inc.*, No. 16-CV-1494, 2017 WL 325189 (D.D.C. Jan. 23, 2017) .... passim

*United States v. Bazaarvoice, Inc.*, 13-CV-133, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ...... 12

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964) ................................................................. 15

ii

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ....................................... 10

*United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) ....................................... 22

*United States v. Franklin Elec. Co.*, 130 F. Supp. 2d 1025 (W.D. Wis. 2000) ........................... 24

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ................................. passim

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ........................................... 15, 16

*United States v. Rockford Mem'l Corp.*, 898 F.2d 1278 (7th Cir. 1990) ................................. 9, 10

**STATUTES:**

15 U.S.C. § 18 ....................................................................................................................... 9

**OTHER AUTHORITIES:**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2016) ...................................... 23

U.S. Dep't of Justice and Fed. Trade Comm'n, Horizontal Merger Guidelines
   (2010) ................................................................................................................... 11, 12, 16, 20

U.S. Dep't of Justice, Policy Guide to Merger Remedies (2011) ........................................... 22, 23

## INTRODUCTION

Deere & Company ("Deere") plans to acquire Precision Planting LLC ("Precision Planting"), its most significant competitor in the market for high-speed precision planting systems. High-speed precision planting systems enable farmers to plant accurately at up to twice conventional planting speeds, saving time and costs, and improving the likelihood of higher crop yields. The acquisition would forge a virtual monopoly in this market, likely leading to higher prices, lower quality, reduced innovation, and fewer options for American farmers. Under intense competitive pressure from Precision Planting, and faced with the prospect of price cuts to its own high-speed system, Deere chose to purchase its "number one competitor"[1] rather than compete with it. Under Supreme Court and Seventh Circuit precedent, the high market share and concentration in high-speed precision planting systems make the proposed acquisition presumptively anticompetitive and unlawful. Beyond this presumption, it is clear that the proposed transaction would likely substantially reduce competition by eliminating well documented head-to-head competition between Deere and Precision Planting.

Defendants cannot overcome the overwhelming presumption of illegality, nor can they explain away the real-world anticompetitive effects that would arise were this acquisition permitted to proceed. Though Defendants claim purported efficiencies from the proposed acquisition, those efficiencies are speculative and achievable without this anticompetitive transaction. And Defendants' attempt to offset the likely substantial competitive harm by offering mere contract modifications to Precision Planting's customer-partners and a license to a third party that lacks the resources and ability to replace the lost competition fails to overcome Defendants' heavy burden.

---

[1] PX-416, Ag Solutions Managers Meeting Tr. at 28:3–4.

## STATEMENT OF FACTS

Farmers rely on planters to plant millions of acres of corn, soybeans, and other row crops each year.  Because planting performance can determine a crop's success or failure, planters are one of the most critical pieces of equipment on a farm.  The two key components of a planter are the toolbar and row units.  The toolbar, which attaches to a tractor that pulls the planter, provides the basic framework of the planter.  Row units attach to the toolbar and contain planting systems that dispense seeds to trenches in the ground.  In the United States, Deere is by far the dominant planter manufacturer, accounting for more than half of new planter sales.

Each year, farmers aim to plant all crops within the optimal planting window—the narrow set of days each season when planting conditions are most likely to produce high crop yields.  This window, which varies by region, crop, and year, can grow even shorter as unpredictable weather alters the balance of soil moisture and temperature needed before planting can begin or resume.  Meeting this goal has become more important as crop prices have fallen and more difficult as farm sizes have increased.  In addressing this challenge, farmers historically have faced a trade-off between planting fast and planting accurately.  Planters equipped with conventional planting systems typically have been limited to operating at around five miles per hour to assure accurate seed placement, which is essential to maximizing plant growth and overall crop yield.  Although planting faster with a conventional planter can compromise seed spacing, planting at conventional speeds can result in planting outside the optimal planting window.  This trade-off between speed and accuracy changed in early 2014.

Precision Planting, a subsidiary of Monsanto, is a highly innovative company that has been at the forefront of planting developments for more than a decade.  In January 2014, after years of development, Precision Planting announced its SpeedTube-based high-speed precision

planting system. This "breakthrough"[2] system, which can be retrofitted onto planters sold by Deere and other manufacturers, enabled farmers for the first time to maintain accuracy at up to twice conventional planting speeds. Planting at higher speeds saves farmers time and costs, and better enables planting within the optimal planting window, thereby increasing crop yields.

High-speed precision planting systems include an electric drive, an advanced seed meter, a patented seed-delivery cartridge, and a control system, which farmers use to monitor and adjust the system from the tractor. The electric drive powers the seed meter, which isolates and evenly spaces each seed before delivering it to the seed cartridge. The seed cartridge is a critical component of the system. It maintains the spacing of each seed from the meter to the ground and projects the seed from the cartridge to counteract the speed of the planter. This contrasts sharply with conventional systems that often rely on mechanical components and merely drop seeds to the ground by gravity through a hollow tube, allowing seeds to ricochet and group together in the tube and tumble erratically on the ground.

A month after Precision Planting's SpeedTube announcement, Deere announced a competing high-speed system called ExactEmerge. Deere views this system, which it first introduced only as a factory-installed option on new Deere planters, as ███████████ ███████████[3] Introduction of the two companies' high-speed systems intensified competition between Precision Planting and Deere, which has long harbored concerns about Precision Planting's role as a disruptive innovator in planting equipment. As Precision Planting explained in February 2014, "it has become clear that the new planter battleground is 'SPEED', and there are two distinct paths, Deere and Precision Planting."[4] Through fierce competition to develop,

---

[2] PX-261 at -876.
[3] PX-391 at -007.
[4] PX-232 at -621; *see also* PX-428 at -137.

market, and sell these systems, Precision Planting and Deere have pushed each other to offer better products and lower prices to American farmers.

Competition from Precision Planting pushed Deere to develop and improve its ExactEmerge system. As Deere acknowledged in the 2012 charter seeking approval to develop ExactEmerge, "[t]he largest competitive planter pressure comes from an aftermarket company, Precision Planting."[5] After initially introducing ExactEmerge as a factory-install-only product, Deere ████████████████████████████████████████████████████ ████████████████████████."[6] It therefore introduced an ExactEmerge retrofit kit in summer 2015. Competition from Precision Planting also pushed Deere to partner with Dawn Manufacturing to offer hydraulic downforce, which complements high-speed systems by improving their ability to plant in certain field conditions. As one executive explained, partnering with Dawn allowed Deere to "go head-to-head against Precision Planting. We're 'taking off our gloves' and Dawn's tools and technology are a significant weapon in battling against Precision."[7] Precision Planting also felt pressure from Deere to continue developing its high-speed products: "We NEED to have first mover advantage," one Precision Planting executive explained. "[T]he sharks (Deere) surround us and threaten to swallow us whole."[8]

Deere and Precision Planting also competed intensely in high-speed precision planting sales, targeting their marketing against each other. For example, in response to a sales complaint that "[t]hese guys are killing us," a Deere executive responded, "[y]eah I know. I am trying to put a big focus on this and get us aggressive on marketing towards [Precision Planting]. We have an awesome benchmarking plan where we will do a comparison of exactmerge vs

---

[5] PX-002 at -722.
[6] PX-047 at -939; *see also id.* at -957.
[7] PX-119 at -901; *see also id.* at -898 ("Dawn's [hydraulic downforce] is the perfect match for John Deere's new ExactEmerge planting technology."); PX-021.
[8] PX-242 at-047–48.

[Precision Planting's] speed tubes this season."[9]  Deere also engaged ███████████████ to conduct tests to use in ExactEmerge marketing material as part of its effort to "get as much data as possible on how ExactEmerge performs . . . versus the Precision Planting SpeedTube solution."[10]

Precision Planting pursued an aggressive pricing strategy targeting Deere, which resulted in lower prices for both SpeedTube and ExactEmerge.  When Precision Planting set the initial price for SpeedTube, it adopted a lower price than it had earlier proposed to give Precision Planting a price "advantage over [D]eere."[11] ███████████████████████ ████████████████████████████████████████████ ███████████████████████ █████████████████████████████████ ██████████████████████████  For example, in response to a Precision Planting promotion, Deere launched ███████████████████████████ █████████████ ██ [13] and a $250 per row rebate (about 8% off) to "assist with those having price battles" with Precision Planting.[14]  Similarly, to combat Precision Planting, Deere offered an incentive encouraging farmers to trade in used ExactEmerge planters for new ExactEmerge planters ████████████████████████████████████████████████████ ███████████████████████.[15]

Deere has also had longstanding and growing concerns about Precision Planting's retrofit approach challenging Deere's lucrative business model and dominance in the planting industry.  Precision Planting's retrofit products threaten Deere by allowing farmers to delay purchasing

---

[9] PX-005 at -919.
[10] PX-416, Ag Solutions Managers Meeting Tr. at 33:19–36:16.
[11] PX-225 at -136; *see also, e.g.*, PX-240.
[12] PX-007; PX-024 at -695; PX-196 at -556; PX-197.
[13] PX-037 at -842.
[14] PX-009 at -266.
[15] PX-008 at -129; PX-006 at -602.

new planters and instead obtain high-speed and other capabilities by retrofitting their existing planters with Precision Planting's components at a small fraction of the cost of purchasing a new Deere planter. As one executive observed, "the current trend that we are starting to see of farmers ordering stripped down versions of planters to be retrofitted with [Precision Planting] products [is] now threatening to impact also demand for [planters]."[16]

In addition to competing directly with Deere, Precision Planting strengthened Deere's planter rivals—CaseIH and AGCO—by partnering with them to make its high-speed system available for factory installation on their new planters. More than mere supply agreements, these original equipment manufacturer ("OEM") partnerships forged collaborative relationships to continue improving Precision Planting's high-speed system. ███████████████████

███████████████████████

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[18]

These partnerships also contributed to Deere's concern that Precision Planting's efforts could commoditize the planter toolbar. Deere feared farmers would become less willing to buy expensive Deere planters if they could buy cheaper planters from other companies just for the toolbar and outfit the row units with Precision Planting components. Precision Planting's partnerships with CaseIH and AGCO elevated this commoditization concern. As noted in a Deere presentation analyzing the proposed acquisition, "[a]dditional factory availability of

---

[16] PX-127 at -693.
[17] PX-122 at -694–95.
[18] PX-137 ("████████████████████████████████████████████████."); PX-076.

[Precision Planting] product creates significant risk of commoditizing the planter toolbar within the industry . . . this would have a negative impact to Deere net sales and overall profitability."[19]

██████████████████████████████████████████████

███████████████████████ █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ The problem, as one Monsanto executive recalled, was that it "need[ed] to get a [Precision Planting] deal first since our purchase and competition in this space has poisoned many in Deere to doing anything with us."[21]  As an agreement crystallized, Deere President John May remarked to the head of Precision Planting, "you've been kicking our butts for the last 3 years and we're really glad you are coming on board."[22]

By acquiring Precision Planting, Deere would accomplish two key goals.  First, it will be able to disadvantage its planter rivals.  In a September 2015 presentation on post-acquisition plans, Deere noted it would "[p]osition [Precision Planting] as a retrofit solution, not an OEM solution" and "temper[]" Precision Planting's partnerships with other planter manufacturers.[23]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.[24]

---

[19] PX-045 at -390.
[20] PX-222 at -351.
[21] PX-281 at -893; *see also* PX-441, Stern Tr. at 109:15–110:2.
[22] PX-284 at -059.
[23] PX-045 at -391, -399.
[24] PX-120; PX-164 at -896; PX-406, Guinn Tr. at 263:22–64:9.

Second, acquiring Precision Planting would give Deere a dominant position—98% by Deere's own calculations—in the ██████████, enabling it to charge higher prices.[25] ██



On November 3, 2015, Deere announced that it would acquire Precision Planting. ██

[25] PX-193 at "Appendix PPAT Industry Concentr."
[26] PX-129 at -558.
[27] PX-056.
[28] PX-085 at -595.
[29] PX-032 at -845–46.



The United States sued to block the transaction on August 31, 2016.[32]

## ARGUMENT

Section 7 of the Clayton Act prohibits mergers and acquisitions "where in any line of commerce . . . in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Congress used the word "may" in Section 7 "to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962); *see also FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016). Section 7 "prevent[s] transactions *likely* to reduce competition substantially." *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1283 (7th Cir. 1990) (emphasis added). "A certainty, even a high probability, need not be shown." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989). Accordingly, the United States need show only that the proposed acquisition "create[s] an appreciable danger of [anticompetitive] consequences in the future." *Advocate Health*, 841 F.3d at 467 (quotations omitted). "[D]oubts are to be resolved against the transaction." *Id.* (quoting *Elders Grain*, 868 F.2d at 906).

---

[30] PX-178 at -923; PX-115 at -417 ("                                                    
                    ."). 
PX-133 at -222; PX-091 at -211; PX-132.

**A.      The Relevant Market.**

The core question in a merger case is whether the acquisition may create or facilitate the exercise of market power—the ability to price "above the levels that would be charged in a competitive market." *Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 27 n.46 (1984); *see also Advocate Health*, 841 F.3d at 465 (focusing on "[c]oncerns about potential misuse of market power resulting from a merger"); *Rockford Mem'l*, 898 F.2d at 1283.  In answering this question, courts routinely define the relevant product and geographic markets—"the area of effective competition"—in which the merging firms compete.  *Advocate Health*, 841 F.3d at 467 (quoting *Brown Shoe*, 370 U.S. at 324).  "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one."  *Id*. at 468 (quoting *Brown Shoe*, 370 U.S. at 336).  "The market must correspond to the commercial realities of the industry."  *Id*. (quotations omitted)

In this case, evidence of the commercial realities and nature of competition between Deere and Precision Planting establish that high-speed precision planting systems is a relevant product market.  And Defendants have stipulated that "[t]he relevant geographic market is no larger than the United States."[33]

**1.      High-Speed Precision Planting Systems Is a Relevant Product Market.**

A relevant product market includes those "commodities reasonably interchangeable by consumers for the same purposes."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956); *see Advocate Health*, 841 F.3d at 467.  Accordingly, the question of "reasonable interchangeability" is fundamentally an inquiry into what products consumers would substitute for other products if prices in the relevant market increase.  *See Brown Shoe*, 370 U.S. at 325.  To help answer this, courts frequently apply the "hypothetical monopolist test" from the

---

[33] R. 222, Ex. A, ¶ 5.

Horizontal Merger Guidelines ("Merger Guidelines").[34]  The hypothetical monopolist test asks whether a hypothetical profit-maximizing monopolist of all products within a proposed market likely would impose a "small but significant non-transitory increase in price" ("SSNIP")— typically five percent—on at least one product sold by the merging firms.  *See* Merger Guidelines § 4.1; *Advocate Health*, 841 F.3d at 468–69.

Here, the hypothetical monopolist test supports high-speed precision planting systems as a relevant product market.  The United States' expert, Dr. Tasneem Chipty, will explain that a hypothetical monopolist over high-speed precision planting systems would likely find it profitable to charge at least five percent more for at least Deere's high-speed system than it would charge absent the merger.[35]  ██████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████.[36]  Because, ██████████████████████████,
a hypothetical monopolist over high-speed precision planting systems would likely find it profitable to maintain prices ██████████████████ over the competitive level, high-speed precision planting systems is a relevant product market.  *See Advocate Health*, 841 F.3d at 465, 473–76.

████████████████████████████████████████████████████
██████████████████████ provide direct support for finding that high-speed precision planting systems is a relevant product market.  *See FTC v. ProMedica Health Sys., Inc.*, No. 3:11-CV-47,

---

[34] U.S. Dep't of Justice and Fed. Trade Comm'n, Horizontal Merger Guidelines (2010), *available at* http://www.justice.gov/atr/public/guidelines/hmg-2010.pdf.  Though not binding on this Court, courts routinely consider the Merger Guidelines to be persuasive authority.  *See, e.g.*, *Advocate Health*, 841 F.3d at 465–66; *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1075 (N.D. Ill. 2012).
[35] PX-478 at ¶¶ 104–10.
[36] PX-056.

2011 WL 1219281, at *54 (N.D. Ohio Mar. 29, 2011) ("Evidence that predicts a price increase for a group of products 'can itself establish that those products form a relevant [product] market.'" (quoting Merger Guidelines § 4)); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075–76, 1082 (D.D.C. 1997) (*Staples I*); *see also Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) ("finding of actual, sustained adverse effects on competition . . . [was] legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis." (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986))).

Courts also often look to "practical indicia" to assist in defining a relevant market. *See Brown Shoe*, 370 U.S. at 324–28 (citing, *inter alia*, industry recognition, product characteristics, and pricing practices as relevant indicia); *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006) (though *Brown Shoe* "practical indicia" do not exclude the need for economic analysis, they are "important considerations in defining a market").

The practical indicia here are strong. ███████████████████████████ ████████████████████████████████████████████████████████████. *See, e.g.*, *United States v. Bazaarvoice, Inc.*, 13-CV-133, 2014 WL 203966, at *66 (N.D. Cal. Jan. 8, 2014) (finding that a merging party's "recognition that [the other party] was its primary competitor supports the determination that R&R platforms are the relevant product market"). In October 2015, Deere executives calculated market shares for the ███████████████, concluded that Deere and Precision Planting held a 98% share █████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[37] PX-193 at "Business Climate (PPAT)" and "Appendix PPAT Industry Concentr;" *compare* PX-193 at "Business Climate (PPAT)" *with* PX-192 at "Business Climate (PPAT)."



███████████████████████████████████████,[38]  Others in the industry hold a similar view.  ██████████████████████████████████████████

████████████████████████████████████████

High-speed precision planting systems also have unique product characteristics because they enable accurate planting at twice conventional planting speeds.  Defendants emphasize that their high-speed systems represent a significant technological leap from conventional planters and frequently highlight differences between high-speed and conventional planting systems. Precision Planting, for example, boasts on its website that SpeedTube enables planting "2X [f]aster" than conventional planting systems.  And Deere describes ExactEmerge as a ████

████████████████████████████████████████████████████████████████████

███████████████████████[40]

Defendants' pricing of high-speed precision planting systems also distinguish it as a relevant product market.  The prices of Defendants' high-speed precision planting systems are sensitive to each other's movements.  When Precision Planting introduced a financing program that lowered the effective price of its system, Deere responded with its own ███████████████ and rebate.[41] ████████████████████████████████████████████

███████████████████████████████████.[42]

This evidence, combined with other documents, testimony, and Dr. Chipty's economic analysis, establish that high-speed precision planting systems is a relevant product market.

---

[38] PX-428 at -134.
[39] PX-302 at -559.
[40] PX-098 at -432.
[41] PX-037 at -842; PX-009 at -266.
[42] PX-240; PX-225.

## 2. Defendants' Arguments Fail To Undermine the Proposed Product Market.

Without proposing an alternative definition of the relevant product market, Defendants simultaneously claim that a relevant market of high-speed precision planting systems is both too narrow and too broad. Neither of these internally inconsistent positions undermines the high-speed precision planting systems market.

Defendants claim that the high-speed precision planting systems market is too narrow because it excludes products that could improve yields for some farmers (*e.g.*, GPS systems, seeds of different shapes and sizes). But those other yield-improving products are not functionally interchangeable with high-speed precision planting systems because they boost yields in ways other than by enabling faster planting; as one Deere dealer testified, it is "comparing like cats to oranges."[43] And products do not belong in the same market if they are not functionally interchangeable.[44] Indeed, farmers can use other yield-improving products in conjunction with high-speed precision planting systems to further enhance their yield above and beyond what would be possible with only either a high-speed precision planting system or another yield-improving product. In economic terms, the other yield-improving products are complements to, not substitutes for, high-speed precision planting systems.[45] Moreover, even if it were possible to define a market encompassing high-speed precision planting systems and all

---

[43] PX-447, Tice Tr. at 94:19–95:9; PX-425, Meade Tr. at 182:10–183:4 ███████████
███████████.

[44] *Cf. FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25 (D.D.C. 2015) ("Whether goods are 'reasonable substitutes' depends on two factors: functional interchangeability and cross-elasticity of demand."). Even products that *are* functionally interchangeable do not necessarily belong in the same market. *See United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 54–60 (D.D.C. 2011).

[45] *See* PX-478 ¶¶ 62–63.

other yield-improving products, such a market would not disprove the existence of a relevant market for only high-speed precision planting systems within that broader market.[46]

Defendants also claim that the high-speed precision planting systems market is too broad because it includes both factory-installed and retrofitted high-speed systems. But the evidence here shows that factory-installed systems compete with and constrain the pricing of retrofit systems (and vice versa). ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.[47] Defendants' documents also reflect

████████████████████████████████████████████████████

██.[48] And even Deere's economic expert conceded that Deere's "███████████████

████████████████████████████████████████████████████

███████████████████████.''[49]

## B. The Proposed Acquisition Is Presumptively Illegal Under Section 7 Because the Combined Firm Would Control an Undue Share of a Highly Concentrated Market.

Once the United States has properly defined the relevant markets, it establishes a prima facie violation of Section 7 by showing that the transaction would result in "a firm controlling an undue percentage share of the relevant market," and result in "a significant increase in the concentration of firms in that market." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963); *see also FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001); *OSF*, 852 F. Supp.

---

[46] *Cf. United States v. Cont'l Can Co.*, 378 U.S. 441, 457–58 (1964) ("That there may be a broader product market made up of metal, glass and other competing containers does not necessarily negative the existence of submarkets of . . . cans and glass together . . . ."); *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 309 (7th Cir. 1976) ("[T]he fact that aerosols and other spray equipment are interchangeable with brushes and rollers for some limited end uses does not negative the existence of a separate brush-and-roller market.").

[47] PX-024 at -695, -700–01.

[48] PX-244; PX-225; PX-224; PX-184 at -307; PX-008; PX-444, Stroh Tr. at 195:5–196:11.

[49] PX-486, Bresnahan Tr. at 184:3–185:14.

15

2d at 1074. "[I]f the government makes this [prima facie] showing, a presumption of illegality arises." *OSF*, 852 F. Supp. 2d at 1074 (quotations omitted).

Courts use two different indicia of concentration to establish the presumption. In *Philadelphia National Bank*, the Supreme Court found a relevant market unduly concentrated when the merging parties controlled 30% of the market. 374 U.S. at 364. Additionally, courts routinely apply the Herfindahl–Hirschmann Index ("HHI")[50] thresholds set forth in the Merger Guidelines. *See, e.g.*, *OSF*, 852 F. Supp. 2d at 1079–80. Under that approach, mergers that cause HHIs to increase by more than 200 points and result in a post-merger HHI of at least 2,500 are presumed likely to enhance market power. Merger Guidelines § 5.3.

As Dr. Chipty's chart below shows, the proposed acquisition exceeds the presumption threshold by every measure: the market shares (⬛⬛⬛⬛⬛⬛⬛), the HHI (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛), and the increase in HHI (⬛⬛⬛).



In fact, both the HHI and the increase resulting from the proposed acquisition significantly exceed the relevant thresholds. The presumption thus easily applies here. *See, e.g.*, *Phila. Nat'l Bank*, 374 U.S. at 364; *Heinz*, 246 F.3d at 716 (HHI increase of 510 points from 4,775 created, by a "wide margin," presumption of anticompetitive effects); *OSF*, 852 F. Supp. 2d at 1079–80.

If anything, these figures *understate* how completely this transaction would concentrate the market. First, Deere's own calculations suggest an even more concentrated market than Dr. Chipty's conservative numbers. Shortly before announcing the proposed acquisition, Deere

---

[50] HHI figures are calculated by summing the squares of the individual firms' market shares, giving proportionately greater weight to the larger market shares. Merger Guidelines § 5.3.

calculated market shares for the ████████████████, and attributed a 98% combined share to Deere and Precision Planting. █████████████████████████████████████ █████████████████████████████████████," Deere calculated a pre-merger HHI of 6,728.[51]  Both of these figures exceed Dr. Chipty's conservative market share (████) and pre-merger HHI (████).  Second, Dr. Chipty included two firms—Kinze and Horsch—that purport to have high-speed offerings.  Precision Planting, however, ██████████ █████████████,[52] and Deere's documents discount claims of "high speed" planting with the technology used in the Kinze ████████████.[53] ████████████████████ ████████████████████████████████████: ████████████████████ ██████████████████████████,[54] ████████████████████ █████████████████████.[55]  Dr. Chipty's inclusion of these firms thus offers a conservative estimate of market concentration.

## C. The Elimination of Head-to-Head Competition Between Deere and Precision Planting Is Likely To Harm Farmers.

Although the market shares and concentration levels give rise to a presumption that the acquisition will harm competition, the United States' case is not based solely on market concentration data.  Instead, other evidence shows that the acquisition will eliminate the vigorous competition between Deere and Precision Planting that prevails today, resulting in higher prices and fewer options for American farmers.

---

[51] PX-193 at "Business Climate (PPAT)" and "Appendix PPAT Industry Concentr."
[52] PX-443, Stoller Tr. at 212:18–21; PX-439, Sauder Tr. at 185:13–186:5; PX-397, Arnold Tr. at 73:17–20, 74:8–24.
[53] *E.g.*, PX-123 at -891–92 ("Traditional seed delivery system – that [Kinze's] planter features – is not designed for higher planting speeds above 5-5.5 mph."); PX-223; PX-004 at -676.
[54] PX-373 at -479.
[55] PX-412, Horsch 30(b)(6) (Hiedeman) Tr. at 59:13–20; 62:8–13.

17

First, Deere and Precision Planting are close competitors. ██████████████

████████████████████████████████████████████████████████████

██████████████████ █ ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████ █ ████████ Precision Planting executives wrote that Deere's ExactEmerge

planter is a "[t]hreat[]" ██████████████████████████████████

███,[58] "Mergers that eliminate head-to-head competition between close competitors often

result in a lessening of competition." *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 131 (D.D.C.

2016) (*Staples II)*. And here the evidence shows just that.

The evidence also shows that competition between Deere and Precision Planting has led

to significant benefits for farmers. ██████████████████████████

████████████████████████████████████████████████████████████

████████ █ ████████████████████████████████████████████████

████████████████████████████████████████████████

████████ █ ████████████████████████████████████████████████

████████████████████████████.[61] By acquiring Precision Planting, Deere would

---



[56] PX-191; PX-222 at -351; PX-178 at -923; *see also* PX-416, Ag Solutions Managers Meeting Tr. at 28:3–4 (Precision Planting is Deere's "number one competitor.").

[57] PX-042 at -872; PX-417, Ag Solutions Managers Meeting Tr. at 6:14-18; PX-028 at -727; *see also* PX-111 at -223 (Deere has a "war for acre's covered" with Precision Planting.); PX-117 at -641 (██████████████████████████."); PX-005 at -919 ("These guys [Precision Planting] are killing us.").

[58] PX-290 at -693; PX-291 at -093.

[59] PX-047 at -939, -957, -939; PX-119 at -901; PX-021.

[60] PX-008; PX-006 at -606.

[61] PX-007; PX-024; PX-184 at -307; PX-196; PX-197; PX-224.

eliminate this head-to-head competition. 

."[65]  The

evidence goes far beyond the above-noted presumption of harm and affirmatively demonstrates

that the proposed acquisition will lessen competition substantially.

**D.    Neither Entry nor Expansion Will Ameliorate the Likely Anticompetitive Effects of the Proposed Acquisition.**

Entry or expansion will not defeat an acquisition's likely anticompetitive effects unless it

would "'fill the competitive void that will result if [defendants are] permitted to purchase' their

acquisition target." *H&R Block*, 833 F. Supp. 2d at 73 (quoting *FTC v. Swedish Match*, 131 F.

Supp. 2d 151, 169 (D.D.C. 2000)).  "The mere existence of potential entrants does not by itself

rebut the anticompetitive nature of an acquisition." *Chicago Bridge*, 534 F.3d at 436.  Entry or

---

[62] PX-178; PX-115; PX-133; PX-091; PX-132.
[63] PX-091 at -217 ("                                                            "); PX-145 at -205 ("                                                            ").
[64] PX-133 at -223.
[65] PX-143 at -110.

expansion must be (1) timely, (2) likely, and (3) sufficient to restore lost competition.  *See FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 55 (D.D.C. 1998); Merger Guidelines § 9.

Here, barriers to economically meaningful entry or expansion in the relevant market are high. ████████████████████████████████████████████████

████████.  Extensive intellectual property rights held by Defendants prevent others from adopting important aspects of their respective systems.  ████████████████████████

████████████████████████████████████████████████████████

████████."[66]  Other industry participants have confirmed this.  ████████████████

████████████████████████████████████████████████████████

Brand and distribution are also barriers to entry or expansion.  *See, e.g.*, *Cardinal Health*, 12 F. Supp. 2d at 57; *Sysco*, 113 F. Supp. 3d at 80.  A strong reputation is important in this market because planting equipment is a significant investment and its performance is critical to the season's crop yields.  Distribution through a comprehensive, robust dealer network is similarly important because ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████.[68]  Deere and Precision Planting have expended significant time and resources to establish respected brands and assemble dealer networks with sufficient coverage to serve farmers effectively, and no firm is likely to sufficiently replicate their success in a timely manner.

**E.     No Efficiencies Will Outweigh the Likely Anticompetitive Effects of the Proposed Acquisition.**

Courts have rarely, if ever held that efficiency claims can save an otherwise anticompetitive merger.  *Sysco*, 113 F. Supp. 3d at 82 ("The court is not aware of any cases, and

---

[66] PX-251 at -615.
[67] PX-420, Larson Tr. at 94:23–95:3.
[68] PX-397, Arnold Tr. at 106:19–107:25, 109:25–110:3.

Defendants have cited none, where the merging parties have successfully rebutted the government's prima facie case on the strength of the efficiencies."). "[H]igh market concentration levels require proof of extraordinary efficiencies" to rebut a prima facie case. *OSF*, 852 F. Supp. 2d at 1089 (quoting *H&R Block*, 833 F. Supp. 2d at 89); s*ee also Heinz*, 246 F.3d at 720. Efficiencies must be verifiable and not "mere speculation," *Heinz*, 246 F.3d at 721; merger-specific such that they "cannot be achieved by either company alone," *id.* at 722; and likely to benefit consumers, *see United States v. Aetna Inc.*, No. 16-CV-1494, 2017 WL 325189 at *70 (D.D.C. Jan. 23, 2017).

Defendants' asserted efficiencies do not satisfy this standard. Defendants claim that the acquisition would increase Precision Planting's sales through Deere's dealer network, but Deere dealers already sell Precision Planting components and contracts could expand distribution without the acquisition. Defendants also claim that the acquisition would improve Deere's retrofit and innovation capabilities, ignoring that Deere is fully capable of innovating without acquiring its primary competitor. ███████████████████████████ ███████████████████████████████ Defendants therefore fail to demonstrate the "extraordinary efficiencies" needed to overcome the acquisition's presumptive illegality. *Heinz*, 246 F.3d at 720.

## F.     Defendants' Proposed Remedy Will Not Restore the Competition Extinguished by the Proposed Acquisition.

Attempting to secure approval for the acquisition, Defendants propose a two-part remedy: ███████████████████████████; and (2) licensing some Precision Planting technology to Ag Leader Technology ("Ag Leader"), a small agricultural equipment company. But a remedy must "replac[e] the *competitive intensity* lost as a result of the merger" and "effectively preserve competition in the relevant market." *Sysco*, 113 F. Supp.

3d at 72–73 (quoting U.S. Dep't of Justice, Policy Guide to Merger Remedies at 1 (2011) ("Remedies Guide")[69]); *see also Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972); *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 325–26 (1961). "Defendants bear the burden of showing that any proposed remedy would negate any anticompetitive effects of the merger." *Staples II*, 190 F. Supp. 3d at 137 n.15 (citing *H&R Block*, 833 F. Supp. 2d at 89); *see also Sysco*, 113 F. Supp. 3d at 72; *Aetna*, 2017 WL 325189, at *43. They cannot carry that burden here.

### 1. Modifying Contracts Leaves CaseIH and AGCO Dependent on Deere.

Deere has offered to modify Precision Planting's OEM agreements by ██████████ ████████████████████████████████████████████████████████████ ██████████████████.[70] But even with these modifications CaseIH and AGCO will not be able to compete as effectively against Deere as would be possible if Precision Planting remained independent. After the acquisition, Deere would have the incentive to hamper continued improvements to high-speed technology available to its competitors. Similarly, the right to purchase high-speed precision planting systems from Ag Leader provides little comfort because, as described below, Ag Leader lacks the capabilities of Precision Planting.

### 2. Defendants' Agreement with Ag Leader Does Not Remedy the Proposed Acquisition's Likely Anticompetitive Effects.

Defendants also attempt to alleviate competitive concerns by granting Ag Leader a license to certain Precision Planting components, rather than a functioning business unit. For the reasons explained below, Ag Leader is highly unlikely to replace the competition eliminated as a result of the acquisition.

---

[69] *Available at* https://www.justice.gov/sites/default/files/atr/legacy/2011/06/17/272350.pdf.
[70] PX-175; PX-348.



*See, e.g.*, *Aetna*, 2017 WL 325189, at \*54 ("Although [the buyer] has substantial experience serving the Medicaid population . . . this experience will not transfer so as to enable it to be a successful competitor in the . . . Medicare Advantage market."); *Sysco*, 113 F. Supp. 3d at 77; *accord* IV Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 990c, at 130 (4th ed. 2016) ("[Divestiture] buyers who are not competitors or who are not. . . established in the business may start out at a very considerable disadvantage, which sometimes later proves fatal.").

An appropriate divestiture buyer must have the "financial capability to compete effectively in the market." Remedies Guide at 29.

In contrast, Precision Planting has the backing of Monsanto—a multi-billion dollar corporation.

---

[71] PX-335; PX-433, Myers Tr. at 190:21–192:2.
[72] PX-452, Zielke Tr. at 155:8–156:9.



*See, e.g.*, *United States v. Franklin Elec. Co.*, 130 F. Supp. 2d 1025, 1033 (W.D. Wis. 2000) (expressing concern over divestiture buyer's "limited financial resources").

Courts observe that distribution weaknesses can inhibit the ability of a divesture buyer or licensee to compete effectively. *See, e.g.*, *Sysco*, 113 F. Supp. 3d at 74; *Cardinal Health*, 12 F. Supp. 2d at 57.

*See H&R Block*, 833 F. Supp. 2d at 73 (quoting *Swedish Match*, 131 F. Supp. 2d at 169); *Sysco*, 113 F. Supp. 3d at 74. Where a proposed divestiture buyer or licensee has a record of failing to compete effectively, that record calls into question whether that firm will become a successful, independent competitor. *See, e.g.*, *Aetna*, 2017 WL 325189, at *54 (noting divestiture buyer's "history in the individual Medicare Advantage market . . . raise[d] concerns about its ability to successfully compete following the divestiture").

---

[73] PX-478 at ¶ 177. The "Corn Belt" includes the principal row-crop-growing regions of the United States: Iowa, Illinois, Nebraska, Minnesota, Indiana, South Dakota, Kansas, Ohio, and Missouri.
[74] PX-334 at -255.



That Deere's proposed remedy contemplates further entanglements between Ag Leader and Deere only exacerbates this concern. *See Aetna*, 2017 WL 325189, at *43 ("Courts are skeptical of a divesture that relies on a 'continuing relationship between the seller and buyer of divested assets.'" (alteration omitted) (quoting *Sysco*, 113 F. Supp. 3d at 77)).

## CONCLUSION

Defendants' presumptively illegal proposed acquisition would combine the two principal suppliers of high-speed precision planting systems and end competition that has benefitted farmers through lower prices and innovative products. Accordingly, the United States respectfully requests that the Court enter a permanent injunction preventing the consummation of the proposed acquisition.

---

[75] PX-332 at -195 ( ); PX-331.
PX-322 at -730.

Dated:  April 10, 2017

Respectfully submitted,


/s/ William H. Jones II
William H. Jones II
Adam C. Speegle
Lisa A. Scanlon
U.S. Department of Justice
Antitrust Division, Litigation III Section
450 Fifth Street, NW #4000
Washington, D.C. 20530
Telephone:  (202) 515-0230
Facsimile:  (202) 514-7308
bill.jones2@usdoj.gov

*Counsel for Plaintiff United States of America*